## EL PUEBLO *v.* SUTTON.

### APELACIÓN procedente de la Corte de Distrito de San Juan, Sección 2ª.

No. 243.—Resuelto en marzo 31, 1911.

DERECHO PENAL—HOMICIDIO VOLUNTARIO—PRUEBA DEL CARÁCTER DEL INTERFECTO.—Al acusado que desee presentar prueba del carácter del interfecto y sus antecedentes penales, incumbe demostrar que conocía el mal carácter del interfecto, y no ofreciendo presentar pruebas de esa naturaleza, no comete la corte que deniega la presentación de prueba del carácter del interfecto, error alguno.

ID.—EXCLUSIÓN DE PRUEBA—FUNDAMENTOS DE LAS RESOLUCIONES.—Aun en el supuesto de que los fundamentos de una resolución denegando la admisión de prueba sean erróneos, si tal prueba es debidamente excluída, no es aquello motivo suficiente para revocar la sentencia apelada.

ID.—DEFENSA PROPIA—RESULTADO DE NO ESTIMARLA.—La impugnación hecha por un acusado apelante contra la sentencia apelada por el fundamento de que el tribunal sentenciador no estimó la alegación de defensa propia hecha por él, equivale en sus efectos legales a impugnar la sentencia por no estar sostenida por la prueba.

ID.—CASOS JUZGADOS POR EL JURADO—REVISIÓN DE CUESTIONES PLANTEADAS DURANTE EL JUICIO—EXCEPCIONES.—En los casos juzgados por el tribunal con la intervención del jurado, las cuestiones que surjan durante el juicio pueden revisarse en apelación por medio de excepciones debidamente interpuestas contra la admisión o exclusión de prueba, o contra la concesión o denegación de instrucciones al jurado.

CASOS JUZGADOS POR EL TRIBUNAL DE DERECHO—RENUNCIA AL JUICIO POR JURADO.—En los casos juzgados por el tribunal de derecho, en virtud de haber renunciado el acusado a ser juzgado por el jurado, a la apreciación de los hechos en general hecha por el tribunal, debe dársele el mismo efecto que al veredicto del jurado.

ID.—JUICIOS POR FELONY—MISDEMEANORS—RENUNCIA AL JUICIO POR JURADO.—De acuerdo con la Constitución de los Estados Unidos, una persona acusada de *felony* no puede en dicho país renunciar a ser juzgada por un jurado, pero sí es renunciable el jurado en los casos de *misdemeanor*.

ID.—JUICIO POR JURADO EN PUERTO RICO—RENUNCIA—CONSTITUCIÓN DE LOS ESTADOS UNIDOS.—Los preceptos del artículo 278 del Código de Enjuiciamiento Criminal de Puerto Rico, que conceden al acusado el derecho de elegir el juicio por jurado, excepto en los casos de pena capital, y en virtud de los cuales se entiende que renuncia a ser juzgado por un jurado, si no hace alegación de tal derecho a su debido tiempo, no infringen precepto alguno de la Constitución de los Estados Unidos.

ID.—APRECIACIÓN DE LA PRUEBA—REVISIÓN EN APELACIÓN.—Es doctrina constante de los tribunales Americanos que la apreciación de la prueba hecha por el tribunal sentenciador, no es revisable en apelación para resolver un con-

flicto de prueba, a menos que se demuestre que el tribunal inferior actuó con parcialidad, pasión, prejuicio, o algún, elemento semejante.

ID.—SENTENCIA EN DESACUERDO CON LA PRUEBA—PRUEBA CONTRADICTORIA—APRECIACIÓN DE LA PRUEBA POR EL TRIBUNAL SENTENCIADOR.—No procede la revocación de una sentencia dictada en un caso criminal juzgado por el tribunal de derecho, por haber el acusado renunciado su derecho a· ser juzgado por el jurado, impugnada por estar en desacuerdo con la prueba y ser ésta insuficiente, cuando examinada la prueba resulta que ha sido contradictoria, pues en tales casos la apreciación de la misma hecha por el tribunal sentenciador, es definitiva y no puede ser revisada a menos que se demuestre que actuó con pasión, prejuicio o parcialidad.

ID.—REVISIÓN DE LA PRUEBA—APELACIÓN CONTRA LA SENTENCIA—APELACIÓN CONTRA UNA ORDEN DENEGATORIA DE NUEVO JUICIO.—Los principios que rigen la revisión de prueba en una apelación contra la sentencia, son los mismos que se aplican a la revisión de la prueba en una apelación contra una orden denegatoria de nuevo juicio, y dichos principios son igualmente aplicables a los casos civiles y a los criminales.

ID.—ALEGACIÓN DE DEFENSA PROPIA—HOMICIDIO JUSTIFICABLE.—Para que prospere la alegación de defensa propia y resulte justificable un homicidio, debe demostrarse que el acusado fué objeto de algo más que un simple acometimiento y que éste fué de tal naturaleza que habría de hacer creer a una persona de ordinaria prudencia, que su vida estaba en peligro o que habría de sufrir grave daño corporal.

ID.—ALEGACIÓN DE DEFENSA PROPIA—PELIGRO APARENTE.—No puede alegarse con éxito la defensa propia fundada en el peligro aparente del acusado; es necesario que exista algún acto manifiesto del que ataca, que por su carácter y naturaleza hiciera creer a una persona de ordinaria prudencia, que se encontrara en la misma situación que el acusado, que su vida estaba en peligro, o su persona expuesta a un grave daño corporal, sin cuyos requisitos debe desestimarse la alegación de defensa propia.

ID.—ALEGACIÓN DE DEFENSA PROPIA—DESIGUALDAD DE FUERZA ENTRE EL QUE ATACA Y EL ATACADO.—La desigualdad de fuerza y resistencia física entre dos hombres no justifica al más débil a emplear un arma mortífera para repeler un ataque con los puños solamente, a menos que las circunstancias justifiquen la creencia de que el acometido ha de sufrir un grave daño corporal.

ID.—APRECIACIÓN DE LA PRUEBA—PRUEBA PERICIAL.—Un tribunal al apreciar la prueba pericial no está obligado a aceptar las conclusiones de un perito, tendentes a demostrar que unas heridas no fueron producidas por alambre de púas.

ID.—OPINIÓN DEL TRIBUNAL SENTENCIADOR—TRANSCRIPCIÓN DE AUTOS.—La opinión formulada por el tribunal sentenciador en apoyo de su sentencia no es parte de la transcripción de autos presentada en apelación, ni puede examinarse dicha opinión para determinar las conclusiones de hecho que sirvieran de base al juez sentenciador para dictar sentencia.

ID.—EXAMEN DE LOS HECHOS PROBADOS—PLIEGO DE EXCEPCIONES—RELACIÓN DE HECHOS.—Los hechos probados ante el tribunal inferior únicamente pueden ser examinados cuando constan en un pliego de excepciones o relación de hechos, sin que pueda este tribunal examinar·hechos consignados en la opinión del tribunal como base para la sentencia.

ID.—NUEVO JUICIO—SENTENCIA CONTRARIA A LA PRUEBA.—Confirmada una sentencia apelada por estimar el Tribunal Supremo que no es contraria a la prueba como alega el apelante, procede también la confirmación de una orden denegatoria de nuevo juicio dictada en el mismo caso y fundada en el mismo motivo.

Los hechos están expresados en la opinión.

Abogados del apelante: *Sres. Manuel F. Rossy y Willis Sweet.*

Abogado del apelado: *Sr. Jesús M. Rossy, Fiscal.*

EL JUEZ ASOCIADO SR. WOLF, emitió la opinión del tribunal.

Se interpuso apelación en esta causa contra una sentencia dictada por la Corte de Distrito de San Juan, Sección Segunda. El apelante fué acusado ante dicha corte del delito de homicidio voluntario, eligiendo para ser juzgado el tribunal de derecho sin intervención de jurado. La corte lo declaró culpable del delito que se le imputaba y lo condenó a sufrir cinco años de presidio con trabajos forzados. El apelante solicita la revocación de la sentencia y alega para ello en substancia dos motivos. Que se cometió error de derecho al no admitirse como prueba por la corte una certificación expedida por el superintendente de prisiones, parece que con el objeto de probar el carácter del interfecto José Rosa, así como sus antecedentes penales. Se objetó que esta prueba no era pertinente, negando la corte su admisión por el fundamento de que resultaba de la propia declaración del acusado que éste no conocía a José Rosa con anterioridad al altercado, y que aun cuando el interfecto hubiera sido un hombre de mal carácter, el acusado no hubiera podido saberlo, y también por la autoridad de los casos de *People* v. *Murray,* 10 Cal., 310, y *People* v. *Edwards,* 41 Cal., 640.

Además de omitirse en el pliego de excepciones la copia de la certificación propuesta, no aparece tampoco de dicho pliego que hubiera algún fundamento para la admisión del documento. El carácter del interfecto no era materia de discusión. Se ofreció la prueba, como se ve de los autos, después que toda la prueba del caso se había presentado. In-

cumbía al acusado si quería presentar prueba de esta clase, mostrar o tratar de hacerlo, que conocía el mal carácter del interfecto. No se presentó ni ofreció presentar esa prueba no habiendo, por consiguiente, cometido error la corte al no admitir la referida prueba. (*Henderson* v. *State,* 12 Tex., 525; *Com.* v. *Straesser,* 153 Pa., 452; 26 Atl., 17; *Derkes* v. *State,* 11 Ind., 557; 71 Am. Dec., 370; Véase la nota al caso de *State* v. *Feeley,* 3 L. R. A. [N. S.], 359.)

Mucha importancia se ha dado al error que se supone cometido por la corte al no admitir la prueba, pues aun cuando el acusado no conocía a Rosa, sin embargo, pudo haber tenido conocimiento del carácter turbulento y peligroso del mismo. Las palabras de la corte son como sigue: ''Niego la admisión de la prueba que se propone por la defensa, fundándome en que, según la propia declaración del acusado, no conocía a José Rosa antes de ese momento y el que fuera un hombre malo, no podía saberlo para actuar bajo aquella influencia, y en esos casos no es admisible la evidencia, etc.'' Creemos que lógicamente puede deducirse del uso de las palabras ''el que fuera un hombre malo,'' que pueden estar algo cambiadas en los autos, así como del carácter de la prueba, que la corte tuvo también en cuenta que el acusado no tenía conocimiento del carácter del interfecto Rosa. La clase de fundamentos que se han tenido en consideración para adoptar una resolución debe inferirse de todas las circunstancias del caso. De todos modos, el expresar fundamentos erróneos en resoluciones no es motivo de revocación si aparece claramente que la prueba fué debidamente negada.

El otro error que ha sido alegado es que la corte no prestó debida consideración a la alegación de defensa propia del acusado. Esta objeción debe significar, según sus efectos legales, que la resolución de la corte declarando culpable al acusado del delito de homicidio voluntario no estaba sostenida por la prueba. La prueba presentada y esencial a este caso es como sigue:

Flora Rosa, hermana de José Rosa, declaró que su her-

mano la mandó a coger unos gandules, saliendo él a sacar unas yucas y cuando las sacaba llegó el americano y le habló, y enseguida oyó la declarante el tiro y corrió hacia su hermano, el cual estaba ya muerto y el americano se fué con el revólver en la mano; también estaba allí la hija mayor del muerto, y la declarante vió al viejo Bartolo, y no había más nadie; su hermano cayó boca abajo; no dijo una palabra y murió allí.

Preguntada por el abogado del acusado, dijo que su hermano arrancaba la yuca con las manos porque la tierra era arena y no tenía cuchillo; no vió llegar al americano, sino cuando ya estaba hablando con su hermano, y hablaban ni alto ni bajo; la declarante estaría como a media cuerda de distancia; oía el ruido de la voz pero no las palabras; cuando la declarante sintió el tiro miró hacia donde estaba su hermano y le vió caer y el americano correr; estaban allí la declarante, la hija del muerto, el muerto y el americano y nadie más.

Preguntada por el juez, dijo que las matas de donde cogía los gandules eran grandecitas y no le dejaban ver muy bien a su hermano, estando esas matas entre ella y el sitio en que estaba su hermano, quien estaba solo cogiendo esas yucas; no se dió cuenta de la llegada del americano, sino cuando estaba hablando con su hermano, y siguió cogiendo sus gandules y no tardó mucho en sonar el tiro, y llegó la declarante y no tenía nada en sus manos ni alrededor, sino sólo las yucas. El americano a que se refiere es el acusado.

Juana Rivera declaró que es la madre de la mujer de José Rosa en cuya casa estaba la declarante asistiendo a su hija de parto; José Rosa vivía en la finca de Mr. Sutton en un pedazo de terreno que le tenía arrendado y en una casita que había allí vivían todos. El día del suceso estaba José Rosa sembrando unas yautías y después fué a sacar un pie de yuca para desayunar la familia y llegó el acusado y puso el pie *alante* y le dió una gaznatada a José Rosa, el cual se puso la mano en la cintura y entonces el americano le disparó un tiro y lo mató, muriendo en el acto José Rosa y el americano

se fué con el revólver en la mano; José Rosa se fué encima del americano, amagándole y metiéndole las manos, y cuando le metió las manos, el americano le pegó el tiro.

Preguntado por el abogado dice que ella estaba en la casa de José Rosa, en la cocina, y por un agujero de la cocina que es de yagua, vió cuando el americano hablaba con José y la declarante salió afuera y vió a su hijo político que caía y al americano que corría, y la declarante gritó y corrió la gente; la hermana de José y una chiquita estaban más abajo de la casa y también había otra chiquita, estando las dos con su tía Flora Rosa, las cuales al sonar el tiro corrieron; José Rosa y el acusado sólo tuvieron dos palabras y no hubo lucha entre ellos. José Rosa sacaba las yucas con la mano y para trabajar usaba de una azada, la cual dejó cerca de las yautías.

A preguntas del juez, dijo que la cocina está cercada de yaguas viejas y sólo tenía la puerta de entrada pero sin hojas, y allí estaba la declarante cuando el acusado le habló a José Rosa, y al oir la voz del americano salió la declarante al batey; hablaron dos palabras que no oyó la declarante y cuando el americano le dirigió la palabra, José Rosa se enderezó y el americano le tiró una gaznatada, entonces José le puso las manos en la cintura al americano y éste le disparó un tiro, corriendo para acá, José Rosa cayendo; desde el sitio en que estaban Flora y las chiquitas cogiendo gandules, no podía mirar José Rosa porque estaban al respaldo.

Bartolo Arroyo declaró que vive en la misma finca y el 11 de marzo de 1908, llegó a su casa a eso de las tres de la tarde, que está como a veinte varas de la casa de José Rosa y cuando el declarante pasó por ella, estaba él con una chiquita arrancando una mata de yuca, y llegando el declarante a su casa oyó que hablaba José Rosa y se asomó el declarante por la ventana de su casa, vió llegar a Mr. Sutton y le dijo en voz baja una cosa a José Rosa, y al encontrarle éste, el americano le tiró un jinquetazo a José, éste jaló para atrás y el americano metió la mano en el seno, José saltó a empuñarlo y el declarante se tiró corriendo y al llegar encima de ellos reventó

el tiro y cayó Rosa entre dos tocones, Rosa fué el que saltó a empuñar al americano, el americano se fué corriendo con el revólver en la mano, después del tiro.

Examina un revólver que le pone de manifiesto el Fiscal y dice que así era el que tenía el acusado.

Preguntado por el abogado, dijo que José Rosa estaba en cuatro pies, agarrado del acusado para no dejarle sacar el revólver. El americano tenía una mano fuera y otra dentro del seno que era donde tenía el revólver, los dos estaban en cuatro pies, y José Rosa con sus dos manos tenía cogido al americano por los brazos; José Rosa sacaba unas yucas con la mano, no tenía armas y cerca de sí no había cuchillos ni nada; allí estaba Flora Rosa y una chiquita hija del muerto y Juana Rivera en el fogón haciendo un caldo; lo cual sabe el declarante porque ella se sacó un grito.

Este testigo reprodujo gráficamente ante el jurado su declaración, explicando la forma como los hechos ocurrieron, tomando al acusado y agarrándose con él de la manera que lo vió con José Rosa.

José González declaró que vivía el 11 de marzo de 1908 en el mismo sitio de José Rosa, que es una finca a cargo de Mr. Sutton. Estaba volteando la finca a pie y vió cuando el americano se encontró con José Rosa, agarrándose los dos, tirando José para su casa y el otro para el otro lado, en medio de la lucha el americano jaló por su revólver y le pegó un tiro a José, quien cayó muerto, yéndose el americano corriendo para su casa; la finca está dividida por una calle y en la boca de ésta hay un alambre y en el otro lado hay otro; no reparó si José tenía algún cuchillo.

Preguntado por el abogado, dice que el acusado tenía el revólver dentro del seno de la pretina y lo sacó y pegó el tiro.

El Dr. Manuel Fosas ejerce su profesión en Bayamón y el día 11 de marzo último le hizo la autopsia a José Rosa que murió por una hemorragia de una herida de bala que le atravesó el corazón y los pulmones, cuya muerte debió ser en el acto.

Esta fué toda la prueba de la acusación.

Continuó declarando como testigo de la defensa el Dr. Manuel Fosas, y dijo que en ese día de referencia del Sr. Fiscal, vió al acusado como a las cinco de la tarde, observando varias heridas que tenía, superficiales, como arañazos, hechas con un instrumento poco cortante. Algunas heridas están llenas de tierra y cree que esa tierra háyase producido al caer en tierra después de estar herido el acusado o porque el arma con que fué herido estuviese llena de tierra; en dos o tres heridas observó el declarante que había tierra dentro de ellas. Han podido ocasionarse con un instrumento poco cortante, como un mocho; las heridas correspondían a las ropas que tenía puestas el acusado.

Entonces el abogado del acusado presentó como prueba dichas ropas, sin oposición del Fiscal, y la corte admite la prueba.

El testigo dijo que esas ropas eran las que tenía puesta el acusado el día del suceso, y en la camisa hay un agujero como si fuera de bala y una quemadura que corresponde al agujero; el acusado tenía cinco heridas, unas en el costado y en los muslos y otras en la espalda, correspondiendo con las de las ropas. Preguntado por el Fiscal, dice que tales heridas en la espalda pudieron ser hechas por un alambre de púa, pero no así las del muslo; que los desgarros de la camisa pudieron ser hechos por alambre, y también pudieron ser hechas en lucha con otro individuo.

Vuelto a preguntar por el acusado mediante su abogado, dice que las heridas de detrás pudieron ser hechas por alambre o por un cuchillo de poco corte.

Preguntado por el juez, dice que reconoció al acusado en el pueblo a las cinco de la tarde, estando distante la finca como unos diez minutos; las heridas eran superficiales e irregulares, tenían desgarres y pudieron ser hechas con un cuchillo o arma poco afilada y cortar también las ropas; pero haciendo fuerza; dichas heridas pudieron ocasionarse con un cuchillo no afilado; pero para cortar la tela que tiene la ropa

tiene que ser por un hombre de fuerza. Que el corte que hay en la pierna derecha del pantalón puede producirla tanto un cuchillo afilado, como un machete, un espadín, una hoja de sable o un cuchillo de mesa y el arma haber hecho fuerza en diferentes direcciones.

D. A. Skinner, es sub-secretario de Puerto Rico, conoce al acusado desde 1901, como hombre de buena conducta, sin que haya intervenido en peleas o riñas, tiene muy buen concepto moral del acusado, el cual se dedica a su trabajo.

Preguntado por el Fiscal dice que conoció al acusado primero en Ponce y que es amigo de él y le considera como un caballero.

Ezequiel Mongil declaró que es jefe de la policía de Bayamón; en marzo último y en días de autos estaba el declarante en su oficina y se presentó un negro diciendo que habían matado a su compadre José; fué al sitio en unión del juez y encontró a José Rosa en el suelo y a Mr. Sutton retirado de él, al que ya había arrestado la policía ocupándole un revólver; allí había mucha gente comentando el hecho; el declarante ordenó que llevaran al acusado al pueblo y el muerto al cementerio, y cuando llegaron al pueblo, pasó por allí el Dr. Fosas, o sea por el cuartel de la policía, el declarante lo llamó y entró reconociendo al acusado para lo cual lo hizo desvestir; el declarante vió que el acusado tenía varios rasguños.

Preguntado por el Fiscal no recuerda cómo estaba vestido el acusado, pero estaba en traje de faena lleno de tierra y con las manos sucias.

Césaro Fernández, declaró que conoce al acusado y conoce a José Rosa, y los vió el día de la cuestión. El declarante limpiaba su finca y el acusado pasó por detrás suyo y le saludó estando ocupado en limpiar una caña. Sintió una bulla y vió a unos morenos que eran tres, peleando contra el acusado; al principio el declarante no conocía quien era porque estaba en el medio escondido y en eso lo empujaron y sacó una pierna para atrás y por el pantalón conoció el declarante que era el acusado, y sintió un tiro y el que tenía sujeto al acusado lo

soltó y anduvo un paso largo y se cayó y los demás
salieron huyendo; entonces el acusado echó a correr con la
camisa rota y los trapos guindando.

Preguntado por el Fiscal, dice que estaba distante del sitio
del suceso y entre el declarante y ese sitio había unos pies de
caña que estaban de corte para moler y por encima de las ca-
ñas podía ver el declarante. Las cañas y los que lu-
chaban estaban en un llano y eran muchas, y eran del
declarante que las había comprado a una señora; por allí
había algunas casas y una era de José Rosa y otra de Bar-
tolo Arroyo, estando la primera un poco distante del grupo de
la cuestión, y más cerca la segunda; José Rosa era el que tenía
empuñado al acusado y los demás estaban agrupados, siendo
uno de ellos Bartolo; a los demás no los conocía el declarante
porque hacía poco tiempo que vivía allí.

Preguntado por el Fiscal, dijo que Arroyo no luchaba con
el acusado, pero estaban todos juntos; que cortó la caña un
mes después; vió la cuestión por encima de su caña y conoció
al acusado por un pantalón amarillo porque antes había pa-
sado por el lado del declarante.

Jesús Pérez Martínez, declaró que conoció a José Rosa y
conoce al acusado; el primero tenía un pedazo de terreno y
una casita en la finca del "Quinto" que administra el acusado,
había plantaciones hechas por José Rosa, pero fuera del te-
rreno que tenía arrendado y no le pertenecía, lo cual sabe el
declarante porque era el cobrador de la finca; supo el suceso
media hora después, vió el sitio donde cayó Rosa que estaba
fuera del terreno que le pertenecía; conoce el sitio en que
Rosa sacaba yucas antes del suceso, que estaba también fuera
de su sitio arrendado.

Preguntado por el Fiscal, dijo que Rosa pagaba puntual-
mente su arrendamiento, no sabe de quién eran las yucas; ha-
bía allí gandules de matas grandes.

José Eraso declaró que estaba picando caña en la finca
cuando ocurrió el suceso, el cual no presenció, y Mr. Sutton,
a cuyas órdenes trabajaba el declarante, lo mandó a buscar

la policía como a las tres de la tarde diciendo que estaba herido.

Preguntado por el Fiscal, dijo que el acusado estaba al pie de su casa y no reparó como estaba vestido porque el acusado le mandó a buscar la policía, porque estaba herido y fué a buscarla.

Preguntado por el juez, dijo que la policía vino con el teniente.

George Sutton, declaró que el día del suceso volteaba la finca y al pasar cerca de donde vivía José Rosa, lo vió trabajando en la tierra y vió dos individuos más conversando, a los cuales preguntó ¿quien sembraba? contestándole uno de ellos "yo" y preguntándole su nombre respondió "José Rosa"; le preguntó que dónde vivía, contestándole "yo vivo ahí," señalandole una casita que estaba a unas varas de distancia; le preguntó que cuándo iba a pagar la renta del terreno, que ocupaba y contestó que no debía nada; el declarante le replicó que debía una cuerda desde agosto y respondió que no pagaba ni un centavo; el declarante le dijo que tenía que dejar la siembra y que era la primera vez que los encontraba, pero que le había dejado varias razones en su casa; José Rosa le dijo que era mentira porque nada había dicho en su casa; el declarante insistió en que le había dejado tales razones y que él sabía que todo el que sembraba debía pagar cincuenta centavos por cuerda; Rosa le contestó "¡Carajo, es mentira!" y al mismo tiempo avanzó un paso dándole con la mano, el declarante se defendió y sintió un puntazo en la mano derecha y vió sangre, siguió luchando con Rosa para agarrarle la mano y cuando se la cogió otro individuo le agarró por detrás y sintió un golpe de puño en la cabeza; el declarante metió la mano dentro de la camisa para sacar el revólver y el tercer individuo le cogió por la cintura aguantándole el brazo derecho por lo cual no podía sacar el revólver, seguía teniendo sujeto al José Rosa, el cual le estaba dando golpes y así estuvieron agarrados los cuatro; el declarante sintió un tajo en un pie y levantando el cañón del revólver disparó un tiro

por debajo de la camisa, porque ya ha dicho que el brazo se lo tenía sujeto el otro individuo que se llama José González, y disparó un tiro, enseguida lo soltaron todos, José Rosa anduvo unos quince o veinte pasos hacia su casa y cayó boca abajo; entonces el declarante corrió para su casa, llamó al peón José Eraso para que buscara a la policía porque estaba herido; cuando disparó el revólver lo tenía al lado izquierdo y así disparó y le tenían agarrado dos individuos sin poder precisar si también lo tenía agarrado José Rosa, porque el declarante lo tenía sujeto; vió en la mano de José Rosa un pedazo de machete y era más alto y más fuerte que el declarante; entregó el revólver a la policía; las heridas y los arañazos que el declarante tenía en su cuerpo se los causó en la lucha José Rosa; después de la cuestión el declarante no pasó por debajo de ningún alambre y por eso puede asegurar que los arañazos no fueron de alambre ni de ningún cuerpo extraño, sino que se los causó Rosa.

Preguntado por el Fiscal, dijo que salió a la carretera por un sitio que llaman "Cachete," el cual tiene un lado cercado; el declarante estaba dentro de la finca y por ella salió por una calle que llaman del "Cachete" a la carretera; no pasó por debajo del alambre; conoce a María Rodríguez que vive en la calle de Comerio, cerca del sitio, y entonces vivía dentro del "Cachete."

A preguntas del juez, dijo que la cerca es de alambre de púas y de malla.

Así terminó la prueba de la defensa y entonces el Fiscal propuso contra prueba que le fué admitida.

María Rodríguez declaró que el once de marzo último vivía en el "Cachete" y había varios vecinos entre ellos José Rosa, que vivía más lejos y ese día vió pasar al acusado por el corral de su casa con un revólver en la mano, por los alambres bajando la cabeza; que hay allí tres alambres de púas, dos caídos en el suelo, y otro bien puesto en alto; que al pasar el acusado se le desprendió un pedazo de la ropa por detrás, sin

fijarse si era por la espalda, quedándose el pedazo en el alambre.

A preguntas del abogado, dijo que eso lo hizo llegar a oídos del Fiscal, porque la detective preguntó a la declarante si había visto algo y ella le contestó que había visto pasar por los alambres a Mr. Sutton con el revólver en la mano; que cuando le preguntó eso la detective no estaba presente Mr. Sutton y no puede precisar la fecha en que le tomaron esa declaración, pero la fecha en que la declarante vió pasar al acusado dicen que fué el once de mayo, y sostiene que en ese día, once de mayo, fué que vió pasar por el corral de su casa a Mr. Sutton.

A preguntas del juez, dijo que le dijeron a la declarante que Mr. Sutton había muerto a Rosa en ese día que le vió pasar por el alambre.

Como hemos visto este caso, fué juzgado por la corte sin intervención de jurado. En los casos en que la corte se constituye en sesión con la intervención del jurado, las cuestiones que surjan durante el juicio pueden revisarse en apelación por medio de excepciones debidamente tomadas, ya contra la admisión o exclusión de pruebas, o ya contra la concesión o denegación de instrucciones. En el caso de *Suydam* v. *Williamson*, 20 Howard, 433, el Tribunal Supremo dice:

"Cuando una parte no está satisfecha con la resolución de su causa ante una corte inferior, y pretende que un tribunal superior examine las leyes aplicables al caso, debe cuidarse de plantear aquellas cuestiones de derechos que hayan de ser revisadas, y consignar en los autos los hechos necesarios para ilustración del tribunal de apelación y si dejare de hacerlo así en cualesquiera de las formas autorizadas por la práctica de dichos tribunales, debe conformarse y aceptar las consecuencias de su propia negligencia. La prueba, ya sea oral o documental, ya se practique ante un tribunal de derecho o ante el jurado, no forma parte de los autos, a no ser que se le haga parte por alguno de los procedimientos ordinarios que estén en práctica en la época del juicio y antes de que se dicte la sentencia. Cualquiera que sea el error que pueda haberse cometido, y cualquiera que sea el estado de la causa cuando aquél se cometiera, tal error debe aparecer en los autos, o de lo contrario no podrá ser revisado por un tribunal de

apelación que ejerza su jurisdicción de acuerdo con el procedimiento del derecho común.''

Según el procedimiento autorizado por la ley inglesa, desde la época de la Magna Carta, el jurado era el llamado a juzgar las cuestiones de hecho en los casos que surgieran ante los tribunales, incluyendo los procesos criminales por delitos calificados de *felonies.* En los casos civiles que hubieran de resolverse con arreglo a derecho, las partes tenían y tienen el derecho de renunciar al juicio por jurado. En tales casos la corte substituye al jurado y cuando la decisión de hecho dada por la corte tenga un carácter general, se ha resuelto uniformemente que debe dársele el mismo efecto que si fuera el veredicto de un jurado. (*City of Richmond* v. *Smith*, 15 Wallace, 437; *Basset* v. *United States,* 9 Wall, 40; *Bond* v. *Brown,* 12 How., 255; *Miller* v. *Life Insurance Co.,* 12 Wall., 301; *Norris* v. *Jackson,* 9 Wall, 127; *Simmons* v. *Saul,* 138 U. S., 438; Henderson's Distilled Spirits, 14 Wall, 53; *Appel et al.* v. *Childress,* 116 S. W. (Tex.), 129; *Griffie* v. *McCoy,* 8 W. Va., 201, 19 Dec. Dig. Trial, 1334; Century Digest, Appeal & Error, secs. 3351 et seq., y sec. 3987; Dec. Dig. sec. 846, et seq.) En el caso de *Basset* v. *United States, supra,* la corte se expresa así:

''Cuando un tribunal se constituye en sesión en lugar de un jurado y resuelve las cuestiones de hecho, esta corte no puede revisar su decisión en esa materia. Si en tal caso se hubiere cometido algún error, que aparezca de los autos, en la admisión o denegación de pruebas, puede ser materia de revisión ante esta corte. Pero cuando la corte, por consentimiento de las partes, ejerce las funciones del jurado, su decisión con respecto a los hechos es concluyente, precisamente como si fuera la decisión del jurado dada por medio de su veredicto.''

Y en el caso de *Griffie* v. *McCoy, supra,* se establece (en el sumario) lo siguiente:

''Cuando el juicio se celebra ante la corte, ésta ocupa la misma situación, por lo que respecta a las cuestiones de hecho envueltas en el caso, que ocuparía un jurado si el caso se hubiera juzgado por medio de un jurado.''

En los casos por delitos calificados de *felonies,* cometidos
en los Estados Unidos, un acusado no puede renunciar a ser
juzgado por un jurado, por virtud de preceptos contenidos en
la Constitución de los Estados Unidos y en las varias consti-
tuciones de Estados aunque puede hacer tal renuncia en aque-
llos casos en que el delito sea de menor gravedad. (*Schick*
v. *United States,* 195 U. S., 65.) El procedimiento de revisión
en los casos en que se haya hecho tal sumisión al tribunal de
derecho, siguiendo la práctica del derecho común, según se
establece en el caso de Schick, es necesariamente el mismo
que habría de seguirse en que las partes tuvieran el derecho
a un juicio por jurado. En Puerto Rico, el artículo 178 del
Código de Enjuiciamiento Criminal concede al acusado el
derecho de elegir, cuando no se trata de una causa de pena
capital, el juicio por jurado, y si no lo elige, su derecho a ser
juzgado por un jurado se considera renunciado. Que esa re-
nuncia no envuelve infracción de alguna de las disposiciones
de la Constitución de los Estados Unidos no es cuestión que
pueda ser objeto de discusión ante esta corte. (Ex parte
Acevedo, resuelto en junio 2, 1902; 1 Castro 275; *Trono* v.
*U. S.,* 199 U. S., 533; *Dorr* v. *U. S.,* 195 U. S., 148.) De un
examen de las autoridades en la materia resulta evidente que
cuando un caso que puede ser juzgado por jurado se somete
al juicio de un juez, éste sustituye al jurado y una decisión de
carácter general, con respecto a las cuestiones de hecho dada
por él, puede ser revisada de acuerdo con los mismos prin-
cipios que regulan su revisión en los casos en que se ha emiti-
do veredicto. La lógica y las autoridades hacen aún más
evidente la aplicación de esta doctrina en la consideración de
la cuestión que particularmente se trata de revisar en éste
caso.

Numerosas autoridades pueden encontrarse al efecto de
que el Tribunal Supremo de un Estado no revisará los hechos
para resolver un conflicto de prueba a falta de parcialidad
pasión, prejuicio o algún elemento semejante. Este principio

ha sido seguido por el Tribunal Supremo de los Estados Unidos.

En el caso del *Pueblo* v. *Vance,* 21 Cal., 404, la corte por medio del Juez, Sr. Field, dice:

"La última objeción del apelante de que el veredicto es contrario al peso de la prueba, no tiene fuerza alguna. Hubo prueba tanto a favor como en contra del acusado, y en tales casos nosotros no intervenimos en las facultades del jurado. Debe haber una prueba tan abrumadora en contra del veredicto que justifique la conclusión de que fué emitido bajo la influencia de pasión, o parcialidad de alguna clase, y que justifique una intervención de nuestra parte por lo que respecta a la acción del jurado."

En el caso del *Pueblo* v. *Durrant,* 116 Cal., 201, la corte cita una multitud de casos que sostienen el mismo principio, y dice:

"Si un testigo desacreditara absolutamente su propia declaración jurando con respecto a manifestaciones contrarias de tal manera que unas u otras deban ser falsas, de acuerdo con nuestra legislación su declaración no ha de ser rechazada necesariamente. Ella hace prueba, no obstante, a los efectos del caso. De acuerdo con esa circunstancia, el jurado debe aceptarla y apreciarla. Ellos están obligados a mirarla con sospecha y desconfianza, y pueden rechazarla. Pero, por otra parte, ellos, si lo estiman conveniente, pueden aceptar como verdadera una u otra de las afirmaciones contradictorias. Así, al revisar la prueba este tribunal, no habremos de examinar minuciosamente las alegaciones de que los testigos sean contradichos o que su declaración no es digna de crédito, ni hemos de ver si alguna otra conclusión pudo haber estado justificada por la prueba. (*Blythe* v. *Ayers,* 102 Cal., 254.) *Ad questionem juris respondeant judices, ad questionem facti respondeant juratores;* y ninguna máxima del antiguo derecho ha sido más cuidadosamente conservada en toda su integridad que ésta, en nuestro actual sistema. Cuando no aparece claro que el veredicto se haya dictado o debido dictarse bajo la influencia de pasión o prejuicio, nuestro examen de los autos no tiene más objeto, si se ha ofrecido legalmente prueba que sea suficiente para justificar una convicción, porque el veredicto del jurado es reflejo de su declaración de que esta prueba es la que ha sido por ellos aceptada."

En el caso del *Pueblo* v. *Brittan,* 118 Cal., 411, encontramos la siguiente declaración:

"Ni hubo tampoco, según se alega, tal disparidad en las manifestaciones de los testigos de cargo que puedan hacer que su declaración sea esencialmente increíble o necesariamente indigna de crédito. En realidad no fué mayor que la que generalmente se observa en las manifestaciones de diversos testigos presenciales de un hecho de esta clase."

En el caso de *Johnson* v. *United States,* 157 U. S., 326, la corte dice:

"El examen que hemos hecho de la prueba nos ha causado la impresión de que puede haber motivo para abrigar una duda racional acerca de la culpabilidad del acusado. Pero el jurado que le declaró culpable observó y oyó a los testigos, y debemos deducir de la conducta de la corte al denegar la moción de nuevo juicio de que estaba satisfecha con el veredicto; y como no hemos encontrado error alguno en la resolución de la corte, se confirma la sentencia dictada en este caso."

El Tribunal Supremo de los Estados Unidos ha seguido este principio de modo uniforme. (*Crumpton* v. *U. S.,* 138 U. S., 361; *Moore* v. *U. S.,* 150 U. S., 62.) De un sin número de casos sobre la materia, hemos tomado los anteriores de California y del Tribunal Supremo de los Estados Unidos porque se refieren a casos de asesinato u homicidio. En las colecciones de sentencias abundan casos que sostienen principios iguales.

Parece que el Tribunal Supremo de Nueva York tiene más amplias facultades que nuestra propia corte en los casos de pena capital. En el caso del *Pueblo* v. *Kerrigan,* 147 N. Y., en la página 214, la corte dice:

"Aunque este tribunal tiene facultades en los casos de pena capital para examinar los hechos y conceder un nuevo juicio cuando está convencido de que el acusado no ha tenido un juicio imparcial o cuando se ha cometido alguna injusticia, debe observar los principios

y reglas que tienen aplicación a todos los tribunales que tienen juris-
dicción de apelación.   Es facultad del jurado resolver las cuestiones
de hecho que dependan de las pruebas que en modo alguno puedan
ser contradictorias y declarar por virtud de su veredicto cuál es la
verdad, y una vez determinada ésta, por virtud de prueba que sea
suficiente, aunque susceptible de diversa o contraria apreciación, esta
corte no tiene más derecho que la corte sentenciadora para sustituir
el criterio del jurado con el suyo propio, o usurpar sus legítimas fun-
ciones.''

Nuestras facultades están reguladas por las leyes de 1903
y 1904.

''Sección 1.—Que el Tribunal Supremo de Puerto Rico constituirá
de aquí en adelante un Tribunal de Apelación y nó un Tribunal de
Casación.   En sus deliberaciones y fallos en todos los asuntos, tanto en
lo civil como en lo criminal, dicho tribunal nò se limitará solamente a
infracciones de ley o quebrantamientos de forma, según fueren seña-
lados, alegados o salvados por los litigantes, o según se hiciera constar
en sus exposiciones y excepciones, sino que con el más alto fin de jus-
ticia, el tribunal puede también entender en todos los hechos y trami-
taciones en la causa tal como aparecieren en autos, considerando en
igual forma sus méritos para la mejor administración de justicia y del
derecho, y evitar injusticias y demoras.''
Leyes de 1903, pág. 58.
''Sección 1.—Siempre que resultare de los autos, en alguna causa
criminal apelada a la Corte Suprema, que cualquier requisito legal
haya sido desatendido por el tribunal sentenciador, no se anulará la
sentencia a menos que el error que de los autos resultare, tendiere a
perjudicar los derechos de cualquiera de las partes, y se hubiere inter-
puesto la debida excepción en el tribunal sentenciador; Disponién-
dose, sin embargo, que el tribunal de apelación podrá conocer de
errores fundamentales que aparecieren en los autos, aún cuando no se
hubiere interpuesto objeción a ellos, y fallar sobre los mismos con
arreglo al derecho que de los hechos se desprendiere.''
Leyes de 1905, Sesión Especial, 1904, p. 16.

En una larga serie de resoluciones este tribunal ha se-
guido uniformemente el principio sentado por el Tribunal
Supremo de los Estados Unidos y el Tribunal Supremo de
California.   La cuestión fué sometida debidamente a nuestra

consideración en el caso de *El Pueblo de Puerto Rico* v. *Demetrio Díaz (a) Leña Verde,* resuelto en marzo 6 de 1907, en el que la corte se expresó del modo siguiente:

"Ha sido una cuestión objeto de gran discusión el determinar hasta dónde llega la jurisdicción de una corte de apelación al revocar una sentencia, fundada dicha revocación en que el veredicto del jurado no está sostenido por la prueba. Un gran número de los casos que se encuentran en los libros sostienen que la resolución del jurado basada en la prueba, no debe ser modificada en la apelación. En algunos casos se ha resuelto, casi en el mismo sentido, que si la prueba no es bastante para dar un veredicto fundado en ella, dicho veredicto puede ser anulado en la apelación. Pero estas opiniones amenudo dejan de expresar hasta dónde puede una corte de apelación proceder a considerar la importancia de la prueba en causas criminales en cuyas pruebas está basado el veredicto del jurado. Sería quizás muy difícil, si no imposible, deducir de los casos anotados una regla sobre esta materia que pueda considerarse como que ha sido adopada por todas las cortes. En Florida, Illinois y Texas las cortes han resuelto que es suficiente motivo para que se revoque una sentencia condenatoria el que la corte de apelación tenga una duda razonable con respecto a la culpabilidad del acusado. En muchos otros Estados, entre ellos los de Idaho, Indiana, Kentucky, Louisiana, Michigan, Missouri, New York y Virginia, puede decirse que la regla establecida por las decisiones de dichas cortes, es que no se modificará una sentencia en causa criminal por el fundamento de que el veredicto no está sostenido por la prueba, excepto en casos en que hay una falta absoluta de prueba, o la misma es tan insignificante y tan poco satisfactoria, que la deducción que necesariamente puede hacerse de dicha prueba es que el veredicto es el resultado de parcialidad, apasionamiento o prejuicios. La última regla ha sido sostenida por la Corte Suprema de los Estados Unidos en el caso de *Crumpton* v. *United States,* 138 U. S., 361. En California se ha dicho o ha sido la resolución de su corte de último recurso, que solamente pueden considerarse cuestiones de derecho en la apelación, y si hay alguna prueba que justifique el veredicto del jurado, dicho veredicto no puede ser modificado. (*People* v. *Williams,* 59 Cal., 674; *People* v. *Smallman,* 55 Cal., 185.)

"Esta cuestión se ha discutido, aunque ligeramente, en una nota que se encuentra en el caso de *Armstrong* v. *El Estado de Florida,* cuyo caso se encuentra anotado en 17 *Lawyers' Reports Annotated,* en la página 484. Estamos de acuerdo con la regla establecida por la

Corte Suprema de los Estados Unidos en el caso referido anterior-
mente, de que solamente el jurado debe considerar la importancia de
la prueba presentada por el Fiscal hasta el límite en que la misma fué
contradicha o refutada por los testigos del acusado, y por lo tanto, que
estas cuestiones no son objeto de revisión por la corte de apelación,
por motivo de errores. Si el veredicto fué evidentemente contrario a
la importancia de la prueba, el acusado debió haber hecho una moción
solicitando nuevo juicio bajo ese fundamento, en la corte inferior, pero
la negación o concesión de tal moción es una cuestión discrecional en
la corte sentenciadora. Como regla general puede decirse que esta
corte no revisará la decisión del jurado sobre una cuestión de hecho, a
no ser que la misma sea evidentemente errónea, o el resultado de
parcialidad, apasionamiento o prejuicios.''

El mismo principio hemos sentado en muchos otros casos
de los cuales pueden citarse los siguientes: *Pueblo* v. *Otero,*
4 P. R., 107; *Pueblo* v. *Villegas et al.,* 6 P. R. 460; *Pueblo* v.
*Goitía,* 5 P. R., 252; *Pueblo* v. *Sinigaglia,* resuelto en junio
27, 1907; *Pueblo* v. *Díaz,* resuelto en febrero 1, 1910.

El caso del *Pueblo* v. *Sinigaglia* fué juzgado por el juez
de la corte inferior y, fundándose en resoluciones de Califor-
nia, constituye también autoridad al efecto de que el mismo
resultado ha de seguirse, si se trata de revisar la prueba por
medio de una apelación contra la sentencia que contra una
orden negando un nuevo juicio.

En el caso de Durrant supra, y en el de *Moore* v. *U. S.*
supra, la corte apoya la aplicación de estos principios con
citas semejantes de casos civiles y criminales, y en el caso de
*Shorter* v. *People,* 51 Am. Dec., 293, la corte dice:

''Como se trata de un caso criminal y de pena capital no puede
menos de sentir una gran inclinación a conceder al prisionero un
nuevo juicio. Pero la ley referente a pliegos de excepciones, es la
misma en los casos criminales que en los civiles: *The People* v. *Willey,*
3 Hill (N. Y.), 194, 214, y no debemos permitir que nuestros senti-
mientos nos lleven a establecer un mal precedente.''

En un caso reciente, este Tribunal vuelve a revisar las
autoridades, y citando casos civiles y criminales, dijo:

"Se afirma por el apelante que el veredicto del jurado es contrario a las pruebas, y se ha hecho un gran esfuerzo para demostrar esto, comparando entre sí las declaraciones de los diferentes testigos, y señalando las contradicciones que se alega existen en distintas partes de las declaraciones de determinados testigos, y especialmente en las de la denunciante y su hermano. Hay, sin duda, muchas contradicciones en las declaraciones de los diferentes testigos, comparando las unas con las otras, y algunas incongruencias en las varias deposiciones hechas por algunos de los testigos de cargo. Esto sucede en casi todos los juicios celebrados en causas criminales que sean muy discutidos. Pero es atribución y deber del jurado aquilatar las pruebas y harmonizar, hasta donde fuere posible, las incongruencias o contradicciones que existan en las declaraciones de los testigos, y de separar los granos de verdad de la masa de materia falsa que se encuentre en las mismas, de acuerdo con las debidas instrucciones del tribunal, y de este modo llegar a un veredicto justo, fundado en los hechos que se hayan probado. Por lo que vemos de una detenida lectura de los autos y de los alegatos, ese deber se ha cumplido imparcialmente por el jurado, y no nos creemos justificados en decir que se haya cometido error alguno en cuanto a ese particular. Otro jurado en virtud de los mismos hechos, y bajo las debidas instrucciones, podía llegar a un veredicto completamente distinto, y que nosotros sentiríamos la misma vacilación en revocar." *P. de P. R.* v. *Español,* marzo 30, 1910.

El mismo principio se aplica generalmente a aquellos casos en que los testigos han comparecido ante la corte inferior. Este principio no está basado en una tradición arbitraria, sino en razones de sentido común y de justicia. En el caso de *Quevedo* v. *Sucesión Pino,* resuelto en noviembre 16, 1909, este tribunal dijo:

"Hemos resuelto con frecuencia que el tribunal inferior posee facilidades para apreciar la prueba y determinar la credibilidad que ha de darse a los testigos, que no posee este tribunal, ni ningún otro tribunal de apelación, dentro de la naturaleza de los procedimientos judiciales; y que en caso de que existan declaraciones contradictorias, estaremos muy poco inclinados a desatender las conclusiones a que llegara el tribunal sentenciador en relación con las mismas."

Este tribunal en este caso hizo antes una extensa cita de un caso del Tribunal Supremo de Mississippi, en la que dicho

tribunal expresa todas las manifestaciones humanas que la corte inferior podía observar u oir y que necesariamente no podían ser reproducidas en las páginas de unos autos, y cualquiera de las cuales pudiera determinar el peso de una simple declaración o la credibilidad de un testigo.

Antes de entrar en un examen de los hechos de este caso es conveniente analizar la ley con respecto al derecho de defensa propia en los casos de homicidio. Nuestras leyes disponen:

"Artículo 209.—Podrá también justificarse el homicidio cuando lo cometiere alguna persona en cualquiera de los casos siguientes:

"1. En el acto de resistir o impedir la tentativa de asesinar o de inferir grave daño corporal a alguna persona, o de cometer algún delito grave (*felony*).

"2. Cuando se comete al defender una morada, propiedad o persona contra alguno que manifiestamente intente o procure, por medio de violencia o sorpresa, cometer cualquier delito grave (*felony*), o que violenta, desordenada y tumultuosamente intente o procure penetrar en la morada de otra con el propósito de agredir a alguna persona que se hallare en ella.

"3. Cuando se comete en legítima defensa de dicha persona, o de la esposa o esposo, padre o madre, hijo, amo o sirviente de tal persona, siempre que hubiere motivos fundados para sospechar que existe el propósito de cometer un delito grave (*felony*), o de inferir grave daño corporal, e inminente riesgo de que tal propósito se realice, pero dicha persona o la persona cuya defensa se intentare, si fuere el agresor o estuviere empeñada en lucha mortal, deberá tratar de desistir de ella, antes de cometerse el homicidio.

"4. Cuando hubiere necesidad de cometerlo, al intentar por medios legítimos, la prisión de algún reo de delito grave (*felony*), o al procurar legalmente mantener el orden público."

"Artículo 210.—La mera sospecha de la comisión de cualquiera de los delitos mencionados en los números 2 y 3 del anterior artículo, para impedir los cuales puede legalmente cometerse el homicidio, no bastará para justificarlo; sino que las circunstancias que concurran deberán ser suficientes para excitar el temor de una persona razonable y será preciso que el matador obre sólo bajo la influencia de dicho temor.

"Artículo 211.—Si del proceso formado resultare justificable o

excusable el homicidio, la persona acusada de haberlo cometido, deberá ser absuelta libremente.''

Código Penal de P. R., págs. 572-573.

Actuando bajo disposiciones sustancialmente iguales, el Tribunal Supremo de California ha sostenido la siguiente instrucción:

''Una persona puede repeler la fuerza con la fuerza en la defensa de la persona, bienes o vida, contra uno que abiertamente intenta o trata por medio de la violencia o de la sorpresa de cometer un determinado delito *misdemeanor* o *felony,* o cualquiera de ellos, o de causar un grave daño corporal a su persona, y el peligro que justificaría al acusado al cometer el acto imputádole, puede ser real o aparente; y el jurado no tiene que considerar si el acusado estaba en verdadero peligro de su vida o propiedad, sino solamente si las circunstancias eran tales que indujeran a una persona de mente sana a creer que su persona o sus bienes estaban expuestos a tal peligro; y si racionalmente podía así creerlo y tenía suficiente causa para estimarlo así, y cometió el hecho que se le imputa bajo tal creencia, aún cuando apareciera que el interfecto no estaba armado, ustedes deben absolverlo.'' *People* v. *Glover,* 141 Cal., 233.

Otros pronunciamientos judiciales interpretando disposiciones de ley semejantes son como siguen:

''Ruffin, C. J., correctamente dijo en el caso de *State* v. *Scott,* 4 Ired. L., 409 (42 Am. Dec., 148), que, 'la creencia de que una persona intenta matarme no ha de impedir que el hecho de yo matarla a ella sea asesinato, a no ser que dicha persona, dé algún paso para llevar a cabo su intención, o por lo menos esté aparentemente en situación de hacerlo así y me induzca por ello a creer racionalmente que intenta hacerlo inmediatamente.' La 'situación' de que se habla no es la de tener los medios a mano para efectuar una intención de dar muerte, sino la de que, por algún acto o demostración, indica al tiempo en que ocurre la muerte la intención momentánea de llevar a cabo su propósito, produciendo por ello una creencia racional, por parte del agresor, que es necesario privarle de la vida con el fin de salvar la suya propia.'' (*Pritchett* v. *State,* 22 Ala., 39 [58 Am. Dec., 250]; Whart. Crim. L. 260; *Harrison* v. *State,* 60 Am. Dec., 452.)

''Es evidente que para probar un caso de homicidio justificable

debe aparecer que algo más que un simple acometimiento ha tenido
lugar contra el prisionero; debe también aparecer que el acometi-
miento fué de tal naturaleza que habría de hacer creer a una persona
de ordinaria prudencia que su vida estaba en peligro.'' (*Wallace* v.
*United States,* 162 U. S., 466; *Allen* v. *United States,* 164 U. S., 498.)

''Tampoco encontramos nada que tengamos que criticar en las
instrucciones referentes a la defensa propia fundada en peligro apa-
rente. Diferentes autoridades que aprobamos, se citan, en las que se
establece correctamente la doctrina al efecto de que no es suficiente que
el acusado alegue que creyó haber estado en peligro, sino que es esen-
cial que haya habido motivos justos para tal creencia, y entonces la
regla quedó formulada sustancialmente de este modo:

''Ahora bien, estos casos se pronuncian en el mismo sentido y son
innumerables, tendentes a mostrar que por lo que respecta a esta pro-
posición de peligro aparente a fin de poder descansar sobre una base
que pueda dar lugar a una conclusión racional, debe existir algún acto
manifiesto de la parte que por su carácter y naturaleza indujera a una
persona de ordinaria prudencia, que se encontrara en la misma situa-
ción que el acusado, a creer—o le diera un justo motivo para creer—
que su vida estaba en peligro, o su persona expuesta a un ataque mor-
tal, y a menos que tal condición existiera, entonces no habría motivo
para que pudiera mantenerse esta proposición; no hay nada a que
pueda ser de aplicación la doctrina de peligro aparente.'' (*Acers* v.
*United States,* 164 U. S., 292.)

''Uno puede defenderse y defender a su familia con armas mortí-
feras contra un ataque criminal, si es necesario el uso de las mismas
para protegerse contra dicho ataque, y puede también defender su
hogar contra un ataque de tal carácter, usando para ello armas seme-
jantes, si fuere necesario, para impedir que el mismo sea destruído o
sufra daño serio; pero un ataque que no constituya *felony* dirigido
contra la persona, la familia o la habitación de uno—esto es, un
ataque que no se verifique bajo tales circunstancias, y con tales medios,
y bajo tales apariencias, que justifiquen la creencia de un peligro de
grave daño corporal a la persona o destrucción o daño serio a la habi-
tación—no debe ser repelido con armas mortíferas.'' (*State* v.
*Countryman,* 48 Pac., 138.)

''Cuando un hombre es golpeado solamente con las manos, y no
tiene motivos para temer que se trate de hacerle un grave daño cor-
poral, no debe devolver los golpes con un arma peligrosa.'' (*Shorter*
v. *People,* 51 Am. Dec., 292.)

''Si el interfecto trataba de quitar la vida al acusado, o de ha-
cerle un grave daño corporal, éste tendría derecho para matar a su

agresor si no tuviera ningún otro medio para impedir el ataque. Pero si el interfecto trató solamente de cometer un ataque que no constituyera un *felony*, como para castigar o pegar al acusado, y éste le mató para impedir tal ataque, ello constituiría por lo menos homicidio." (*State* v. *Benham*, 92 Am. Dec., 417.)

"La corte instruyó también al jurado que "la desigualdad de fuerza y resistencia física entre los hombres no ha de justificar a la parte más débil a recurrir repentinamente, y sin aviso alguno, a un arma mortífera y usarla de modo que pueda ser mortal cuando se le amenazare con un ataque que haya de llevarse a cabo con los puños solamente; a no ser que la situación y condición de las partes, y las circunstancias que les rodeen sean suficientes para inducir a un hombre de ordinaria prudencia y juicio a creer que si la amenaza se ejecuta, ha de seguirse como consecuencia lógica un grave daño corporal, en cuyo caso el prisionero tiene derecho a hacer uso de un arma mortífera." (*State* v. *Thompson*, 74 Am. Dec., 344.)

Según aparece de la prueba sometida a nuestra consideración y que obra en autos, la corte inferior estuvo justificada al creer que Sutton promovió el conflicto agolpeando a Rosa; que el interfecto Rosa no tenía arma alguna; que Rosa trataba solamente de impedir que Sutton usara su revólver. La corte estuvo justificada al creer, según la prueba, que los rasguños que mostraba el cuerpo de Sutton fueron producidos por una cerca de alambres de púas; que dichos rasguños fueron producidos en cualquier otra forma y no con motivo del conflicto, pues, fuera de la afirmación de Sutton (que ha sido negada por los testigos de cargo) no ha habido prueba alguna que demostrara que Rosa tuvo los medios en sus manos o en su posesión, de infligir las heridas que el acusado y el Dr. Fosas describieran; verdaderamente que un juez o un jurado estaría justificado en creer, en aquellos casos en que no se justificara algún hecho como determinante de una cierta lesión, y la persona lesionada no fuera examinada inmediatamente después de ocurridos los hechos, que tal lesión infligida, como las heridas o rasguños a que se refiere este caso, pudieron haber sido producidos de distinto modo, y hasta haberse ocasionado por la persona misma. Aún suponiendo que las heri-

das hubieran sido ocasionadas por Rosa durante el conflicto, la corte tenía el derecho de inferir que Rosa usó de su arma, si es que tenía alguna, para impedir que Sutton usara su revólver. La corte tenía el derecho de creer, aún en el caso de que Rosa hubiera sido el agresor, según afirma Sutton, que éste tomó ventajas sobre aquél y repelió el ataque en forma improcedente. Estas son algunas de las muchas suposiciones que la prueba sugiere, y de acuerdo con las autoridades, la corte estuvo ampliamente justificada en la apreciación que hizo de los hechos, si creyó que Sutton no tenía un fundamento razonable para temer por su vida o esperar que se le causara grave daño corporal. A esta conclusión pudo llegar fácilmente si le merecieron crédito las declaraciones de los testigos de cargo y especialmente la del testigo Bartolo. Si esta corte tuviera alguna duda con respecto a la suficiencia de la prueba, no podría, sin embargo, revocar la sentencia dictada en este caso, porque determinados medios de prueba que se ofrecieron a la corte inferior, no han sido sometidos a nuestra consideración, como la ropa que Sutton llevaba y a la que hace referencia el Doctor, diciendo que muestran rasgaduras que siguen la misma dirección general que las heridas en el cuerpo de Sutton. Esas ropas no se trajeron como *exhibit,* ni se trató de hacer una representación gráfica de ellas, no habiendo más que una simple referencia a las mismas en la declaración del Doctor Fosas.

Tenía también el derecho la corte de no dar crédito a la declaración de algún testigo por razón de la forma en que declarara, y el juez tenía el derecho de ver y observar la naturaleza de las rasgaduras que aparecían en las ropas sometidas a su inspección. La corte no estaba obligada a seguir algunas de las indicaciones que hicieran los peritos referentes a que las heridas no fueron ocasionadas por los alambres de la cerca, sino producidas de alguna otra manera. Una cerca de alambre de púas puede producir heridas serias si una persona pasa violenta y rápidamente por debajo de ella, hecho que es

bien conocido de todas aquellas personas que tienen ganado a
su cuidado.

Se alega por el abogado que las declaraciones de algunos
de los testigos de cargo son contradictorias y opuestas a algu-
nos hechos admitidos como ciertos, pero es muy corriente en
casos de homicidio y accidentes semejantes, que los testigos
más veraces incurran en equivocación con respecto a una par-
te y a una gran parte de su declaración. Es facultad del juz-
gador deducir la verdad. La declaración, por ejemplo, de la
suegra de Rosa es vaga en parte y está en contradicción con
la de algunos otros testigos. Esta parte de su declaración
puede ser debida a su edad o excitación, pero la corte tenía
derecho a dar crédito a aquella parte de su declaración que
tiende a mostrar que Rosa no estaba armado. La declara-
ción de Bartolo Arroyo, por otra parte, aparentemente no es
contradictoria y solamente se ataca en el alegato del apelante
al hacer  una afirmación que no aparece en forma alguna en
los autos. Se alega además, que Sutton fué atacado por tres
hombres, pero aún en el caso de que la corte creyera que hubo
una lucha de tres contra uno, hubo no obstante prueba ten-
dente a demostrar que la lucha entre los cuatro surgió des-
pués de un acto de agresión por parte de Sutton. La corte
tenía también el derecho de creer que la lucha surgió después
que Sutton trató de sacar su revólver.

Hemos examinado la prueba con gran cuidado, y no sola-
mente no encontramos preponderancia de prueba en favor
del apelante que justifique nuestra conclusión de que la corte
actuó movida por pasión, prejuicio, parcialidad, o aún por una
errónea apreciación de la significación de la prueba, sino que
no comprendemos, del examen que hemos hecho de los autos,
cómo podía la corte haber llegado a establecer una conclusión
distinta.

El verdadero fundamento de esta resolución consiste en
que esta corte no tiene facultades en los casos de prueba con-
tradictoria, cuando haya prueba tendente a probar la acusa-
ción y no se demuestra la existencia de prejuicio o de algún

elemento semejante. Se ha alegado, sin embargo, que la corte en su opinión no ha dado debida consideración a la alegación de defensa propia que hiciera el acusado. Tal conclusión no puede correctamente deducirse de un examen de la opinión, pero de todos modos la opinión no forma propiamente parte de los autos. (*Saltonstall* v. *Birtwell,* 150 U. S., 419; *Insurance Co.* v. *Tweed,* 7 Wall, 51; *Rector* v. *Ashley,* 6 Wall, 148; *Gibson* v. *Chouteau,* 8 Wall, 317; *Medberry et al.* v. *State of Ohio,* 24 How., 414; *Dickinson* v. *Planters Bank,* 16 Wall, 250; *Insurance* v. *Boon,* 95 U. S., 140; Citando otros casos, *British Queen Mining Co.* v. *Baker Silver Mining Co.,* 139 U. S., 222; *Lehnen* v. *Dickson,* 148 U. S., 74; *Phenix Ins. Co.* v. *Fuller,* 40 L. R. A., 409; *Pennsylvania Co.* v. *Veisten,* 15 L. R. A., 798; *Hernández* v. *García,* 3 Castro, 181.)

En el caso de *Rector* v. *Ashley, supra,* la corte dijo:

"Ultimamente se ha insistido con frecuencia en que en esta clase de casos, hagamos un examen de las opiniones emitidas por las cortes de Estado, con el fin de determinar las razones que sirvieran de fundamento a sus sentencias, y el punto ha sido objeto de alguna discusión. No es, sin embargo, una cuestión a discutir. Hace más de cuarenta años que se presentó la misma cuestión en el caso de *Williams* v. *Morris,* publicado en el tomo 12 de Wheaton. En aquel caso se insistió en este punto por las mismas razones que se han aducido en el caso de autos, o sea, que con arreglo a los estatutos del Estado, las opiniones de la corte han de darse por escrito y archivarse con los documentos del caso. Marshall, Chief Justice, al emitir la opinión de la corte, resolvió que a pesar de este hecho, la opinión de la corte no formaba parte de los autos y no podía tomarse como fundamento que determinara la jurisdicción o falta de jurisdicción de esta corte."

En el caso de *Dickinson* v. *The Planters Bank, supra,* la corte dijo:

"Verdaderamente que en la opinión de la corte se expresan algunos hechos que parecen haber servido de fundamento, a la sentencia, pero no se expresan en forma de hechos probados. Se dan más bien como razones que justifican la conclusión a que llegara el juez de que no se había probado la supuesta promesa hecha por el demandado.

Es imposible que podamos considerar algo de lo que en este caso aparezca como equivalente a un veredicto especial.''

En el caso de *Insurance Co.* v. *Boon, supra,* la corte dijo:

''Ni el hecho de que la corte inferior expresara algunos hechos en la opinión que emitiera junto con la sentencia habría de alterar las cosas en lo más mínimo, toda vez que aparece que los hechos expresados en la opinión lo fueron, no como hechos probados, sino más bien como fundamento para justificar la conclusión a que llegara el juez y que aparece de autos.''

En una nota que se encuentra en la página 798 del tomo 15 de L. R. A., el reporter indica que el Tribunal Supremo de los Estados Unidos no ha seguido siempre esta misma práctica. Es verdad que esa corte algunas veces ha examinado la opinión de la corte inferior para ver si se ha planteado alguna cuestión federal, pero no para resolver los méritos de uno de los puntos en controversia planteado por las alegaciones en que se fundara la sentencia. En el muy reciente caso de *The City of Memphis et al.* v. *The Cumberland Telephone and Telegraph Co.,* fallado en diciembre 12 de 1910, la corte estuvo dividida con respecto a la proposición de si la opinión de la corte inferior podía ser tomada como fundamento para determinar si había una cuestión federal envuelta en el caso, pronunciándose la mayoría en sentido negativo. En el caso de *Loeb* v. *Columbia Township Trustees,* 179 U. S., 472, fué el que sirvió de fundamento a todos los jueces. El tribunal establece claramente en ese caso la doctrina de que la opinión de la corte inferior no habrá de servir de fundamento al objeto ''de determinar la prueba o hechos probados ante la corte inferior en que se fundara la sentencia.'' Un estudio de nuestros propios estatutos nos lleva al mismo resultado. El artículo 356 del Código de Enjuiciamiento Criminal, según se enmendara por una ley de 1908, tomo de Leyes de 1908, página 56, dice lo siguiente:

''El secretario del tribunal, a quien se haya presentado el escrito al establecerse la apelación, debe remitir al secretario de la Corte Su-

prema dentro de los veinte días siguientes, caso que el pliego de excepciones se hubiera firmado por el juez antes de notificarse la apelación, y en caso contrario, dentro de los veinte días de haberse firmado el pliego de excepciones, seis copias escritas en máquina de escribir del escrito de apelación y del *record* de la causa (una de las cuales ha de ser la original debidamente certificada como tal), el cual *record* consistirá de: 1. la acusación; 2. alegación del acusado; 3. instrucciones de la corte al jurado, si el juicio hubiera sido por jurado; 4. instrucciones denegadas, si las hubiere; 5. el veredicto; 6. moción para nuevo juicio, si la hubiere y la decisión de la corte; 7. opinión y sentencia; 8. pliego de excepciones, si lo hubiere; 9. relación de hechos, si la hubiere; 10. notificación de apelación; 11. certificado del secretario haciendo constar que es copia fiel de los originales existentes en los archivos de la corte. Al recibirse dicho *record* será el deber del secretario de la Corte Suprema dar entrada al caso en el libro de causas de dicha corte.''

No hay necesidad de que se emita una opinión o se establezcan hechos probados, porque, desde luego, se presupone la existencia de un veredicto o de una conclusión de hecho establecida en forma general. Aquí el juez estableció esa conclusión de hecho de carácter general y emitió su opinión en apoyo de la misma. No se trató de darle el carácter de conclusiones de hechos probados, y como hay una relación del caso debidamente certificada, de acuerdo con las autoridades citadas anteriormente, la forma correcta de examinar los hechos es la autorizada por la ley, o sea, el pliego de excepciones o la relación de hechos. La ley que nos da jurisdicción limita nuestras facultades a las ''constancias de autos.'' Leyes de 1903 y 1904, supra, Con respecto a este particular el Tribunal Supremo de los Estados Unidos ha dicho:

''Aunque no es necesario, juzgamos conveniente decir, que el examinar la acción de la corte inferior estamos, desde luego, limitados a las constancias de autos y al caso que de ellas aparece y no podemos, como consecuencia de erróneas indicaciones en relación con los puntos en controversia y la prueba, apartarnos de nuestro deber y resolver, no el caso que de autos aparece, sino un caso imaginario, en que cuestiones no planteadas y no resueltas por la corte inferior tendrían que suplirse, y por virtud de lo cual tendríamos que proceder por conje-

turas y suposiciones para sustituir la falta total de toda prueba sobre un punto determinado.''

*Roura* v. *El Gobierno de las Islas Filipinas,* resuelto en noviembre 28, 1910.

Examinando no obstante la opinión emitida en este caso, vemos que la corte consideró directamente la cuestión de defensa propia. La opinión dice así:

''Antes de dictar mi veredicto en este caso, quiero hacer constar varios hechos y principalmente uno de ellos a cuya declaración me lleva, no sólo la prueba testifical, sino también y muy principalmente la prueba de inspección.

''Por toda la prueba practicada en este caso, llego a la conclusión firme y sin género alguno de duda razonable, de que el día 11 de marzo de este año, en las inmediaciones del pueblo de Bayamón, correspondiente a este Distrito Judicial, George Sutton, como encargado de una finca de la que José Rosa tenía arrendado un pedazo de tierra, encontró a éste en ocasión en que arrancaba de la tierra algunas yucas, y para cuya operación no se valía de arma alguna; no la tenía consigo, ni inmediata a su persona. Que en tales condiciones y por cuestión de los arrendamientos se promovió una discusión entre George Sutton y José Rosa en la que el primero tiró unos bofetones al segundo, yéndose entonces ambos a las manos y durante esa lucha, el acusado George Sutton, con un revólver que tenía bajo la camisa y sin sacar aquél, pero levantando algo el cañón, hizo un disparo que atravezando el corazón de José Rosa, le produjo la muerte casi instantáneamente, después de la cual el acusado huyó teniendo en su camino que cruzar, como cruzó, por unas cercas de alambre de púas que le produjeron varios rasguños en el cuerpo y rotura de la ropa correspondiente a esos sitios.

''Y un punto que deseamos hacer constar categóricamente es que la impresión que nos ha producido el examen de esas roturas de las ropas, presentadas por el acusado como prueba, fueron producidas por desgarro de las púas del alambre de la cerca y no de otra manera.

''El médico que algunas horas después del hecho ocurrido entre Sutton y Rosa reconoció al primero, admite que los rasguños o heridas de bordes sucios que presentaba el acusado en la espalda, hombros y piernas, podían ser causadas por las púas de un alambre o también por algún instrumento de corte no afilado.

''Ante tales suposiciones, la corte se decide francamente porque las roturas de la ropa correspondientes a las heridas o rasguños recono-

cidas en el acusado, no fueron por cuchillo o arma análoga sin filo o con poco filo, sino por púas de alambre.

"Hemos visto con mucha detención las roturas de esta ropa y por la forma en que están, por los diversos girones que cada una de ellas presenta, entendemos y creemos firmemente que no fueron producidas en otra forma que la dicha, pues de lo contrario, esos cortes no tendrían las sinuosidades que presentan, sino que una línea más a menos limpia en sus bordes según el filo del arma conque se produjeran.

"Y esto sin contar con que el acusado que es el único que habla de armas en manos del interfecto, ni afirma ese hecho categóricamente ni ha podido dar una idea de la clase de arma que éste tuviera.

"Y esta convicción la teníamos ya antes de que declarara la testigo María Rodríguez, la que corrobora tal acepción al afirmar que vió al acusado cuando cruzaba por debajo de alambres de púas y con éstas se desgarraba la ropa, a tal punto que algunos jirones de la camisa quedaron enganchados en ellas.

"Por todo lo expuesto somos de opinión de que el acusado es responsable del delito de homicidio voluntario de que ha sido acusado, y que al realizar el hecho que se le imputa no lo verificó en defensa propia."

Es evidente que la corte no dió crédito a la prueba de la defensa, y que por un examen de las ropas quedó convencida de que las rasgaduras que se notaban en las mismas fueron producidas por la cerca de alambre de púas, y no de otro modo, y que Rosa no tenía arma alguna. El juez estimó que Sutton no disparó en defensa propia.

No hay nada en los autos o en la opinión que indique que la corte no prestó debida consideración a todas las cuestiones legales envueltas en este caso y tampoco hay nada que indique elementos de pasión, parcialidad, prejuicio o error por parte de la corte inferior. La sentencia debe ser confirmada.

Ante la corte inferior se presentó una moción interesando la concesión de un nuevo juicio, y denegada, se interpuso apelación también contra esta orden. Como el único fundamento de la moción es que la decisión es contraria a la prueba, la orden apelada debe ser confirmada por los mismos fundamentos que la sentencia.

*Confirmada.*

Jueces concurrentes: Sres. Presidente Hernández y Asociado del Toro.

Juez disidente: Sr. MacLeary.

El Juez Asociado Sr. Aldrey, no tomó parte en la resolución de este caso.

VOTO PARTICULAR EMITIDO POR EL JUEZ SR. MACLEARY.

No pudiendo estar de acuerdo con mis compañeros con respecto a la sentencia confirmatoria dictada en el presente caso, el día 31 del mes próximo pasado, estoy en el deber de exponer las razones que me impelen a disentir.

El día 20 de marzo de 1908, el fiscal del Distrito de San Juan formuló acusación contra George Sutton, imputándole la comisión de un delito de homicidio voluntario, o "manslaughter," por haber causado ilegalmente la muerte a José Rosa.

El juicio tuvo lugar ante la Corte de Distrito de San Juan, Sección Segunda, la cual, después de haber oído las pruebas y los informes de los abogados de las respectivas partes, declaró al acusado culpable del delito expresado en la acusación. No se pidió jurado y la causa fué juzgada solamente por la corte.

El acusado presentó una moción de nuevo juicio, fundando su petición en que la declaratoria de culpabilidad era contraria a derecho y a las pruebas; y habiendo desestimado dicha moción, el tribunal sentenciador, en 16 de diciembre de 1908, dictó sentencia, condenando al acusado a cinco años de prisión en el presidio.

Contra esta sentencia el acusado interpuso recurso de apelación para ante este tribunal, presentando aquí una transcripción de los autos en la que aparecen la acusación, la sentencia condenatoria, el dictamen del tribunal sentenciador, y además, una exposición de los hechos y un pliego de excepciones debidamente preparados y certificados. Dicha transcripción se presentó aquí el día 30 de marzo de 1910.

Nuestra ley dispone en el artículo 178 del Código de Enjui-

ciamiento Criminal, que las cuestiones ·de hecho en casos de delito grave (*felony*) tales como el presente, deben ser juzgadas por un jurado cuando el acusado así lo pidiere, y que dicha elección deberá notificarse al ·tribunal cuando se haga la primera lectura de la lista que contenga la causa. Se exige que esa elección o la renuncia voluntaria al jurado sea debidamente anotada en los autos. De una nota que se encuentra al principio de la tercera página de los autos, aparece que el acusado, al ser presentado al tribunal, negó la acusación y solicitó ser juzgado en juicio ante el tribunal de derecho. Cualquiera informalidad que aparezca de dicha nota no ·tiene importancia, y el acusado no se quejó ante la corte inferior ni ante este tribunal de haber sido juzgado por el tribunal sin un jurado. Si es que se incurrió en algún error con respecto a este asunto, se hizo voluntariamente caso omiso del mismo aún cuando ese error era de importancia, lo que no parece haber sido. Se menciona esto aquí solamente para observar que la mejor práctica es seguir enteramente todas las disposiciones de la ley, ya sean mandatarias o simplemente directorias.

Se alega que un error de derecho ha sido cometido en el juicio, al excluir de la prueba una certificación del superintendente de prisiones, por la que se probaba el carácter del interfecto José Rosa y sus antecedentes penales y el que éste siempre había sido un perturbador de la paz; y el acusado afirmaba, además, que dicho documento demostraba qué pena había sufrido el acusado. El juez ·sentenciador se negó a tomar en consideración dicha certificación fundándose en que, según la propia declaración del acusado, éste no conocía a José Rosa antes del altercado fatal, y aunque dicho José Rosa fuera un hombre malo, no podía saberlo el· acusado para actuar bajo aquella influencia; y que en esos càsos no era admisible la evidencia con respecto al carácter de la persona èn cuestión. En el pliego de excepciones, el juez sentenciador dice que funda su resolución en dos casos de California, a saber: *The People* v. *Murray,* 10 Cal., 310, y *The People* v. *Edwards,* 41

Cal., 640. A estas autoridades, el fiscal de esta corte añade en su alegato otras dos, que son *The People v. Henderson,* 28 Cal., 465, y *The People v. Powell,* 87 Cal., 364.

Por consiguiente, la primera cuestión que se presenta para nuestra consideración es: ¿Debía el tribunal sentenciador haber permitido al abogado del acusado probar el mal carácter del interfecto como un perturbador de la paz y el que había cumplido una condena en la cárcel como tal?

En los casos juzgados por el tribunal solo y sin un jurado, la práctica general seguida por los tribunales en el continente, es admitir, dentro de los límites razonables, todas las pruebas presentadas por el acusado; porque al considerar todas las pruebas testificales conjuntamente, el tribunal puede eliminar las declaraciones que no sean pertinentes; y se halla en mejor posición para separar el trigo de la cáscara (o sea la verdad de lo falso) después de haber oído todos los hechos alegados por ambas partes. En tales casos, los fiscales pueden más eficazmente hacer sus objeciones al efecto de hechos susceptibles de objeción que no a la admisibilidad de las mismas como prueba.

La misma práctica se halla establecida en casos civiles y criminales en circunstancias análogas. Por consiguiente, soy de opinión que cuando se juzga una causa ante un tribunal sin jurado, y se presentan pruebas cuya admisibilidad es dudosa, entonces la práctica más segura es permitir la presentación de dichas pruebas y considerarlas cuidadosamente en unión de las demás pruebas testificales, y en el caso de que resultaren impertinentes o impropias en otro sentido, pueden ser excluídas de la consideración sin perjuicio a los derechos de cualquiera de las partes.

*Belber v. Calvo,* resuelto en 19 de mayo de 1910.

*People v. Rosado,* resuelto en 31 de mayo de 1910.

Pero la cuestión de la admisibilidad de esta prueba ha sido claramente planteada ante este tribunal, y debe ser resuelta por nosotros, de acuerdo con los verdaderos principios de la práctica criminal, según han sido enunciados en las autori-

dades reconocidas como tales en esa materia. Examinaremos, pues, dichas autoridades, y en primer lugar, las citadas por el Ministerio Fiscal.

Todas ellas son casos de California y citaremos los párrafos más importantes de cada una de las cuatro opiniones. Dicen literalmente lo que sigue:

"El otro punto alegado es la exclusión de pruebas referentes al carácter del interfecto como hombre turbulento, atrevido y violento. Es una regla bien establecida el que no se pueden presentar pruebas con respecto a la reputación del interfecto, a no ser que las circunstancias del caso hagan surgir a lo menos una duda en cuanto a la cuestión de si el acusado obró en defensa propia. No es excusa en un asesinato el que la persona asesinada haya sido un hombre malo; pero se ha declarado que a veces se pueden presentar pruebas respecto de la reputación del interfecto para demostrar que el acusado fué justificado en creer que estaba en peligro, cuando las circunstancias de la lucha son dudosas. Pero los antes deben demostrar este estado del caso.

"*People* v. *Murray,* 10 Cal., 311.

"Habiéndose negado el tribunal a permitir al acusado el que probara con McIntire, Ford, Hardford y otros, que en la reunión pública en la noche en que se cometió el homicidio, el interfecto sacó su cuchillo contra un forastero, y lo hubiera herido si no se lo hubieran impedido; y también que dió a otro hombre un golpe en la mejilla con el cuchillo abierto profiriendo al mismo tiempo palabras amenazadoras; tal resolución se señala como un error. Se admitió que el acusado no había estado presente en el momento en que los hechos presentados como prueba, habían ocurrido; y el abogado del acusado no ofreció demostrar que el acusado había sido informado de esos hechos. El fiscal manifestó en ese momento que no se oponía a que presentasen como prueba cualquiera declaración hecha por el interfecto contra el acusado. Nosotros creemos que no se cometió error alguno al excluir esos hechos y riñas ocurridos entre el interfecto y otras partes, que no tenían relación alguna con el acusado. Y con menos plausibilidad aún puede sostenerse que los hechos de carácter análogo, que ocurrieron unos diez días antes, y que la defensa ofreció probar mediante otros testigos, eran admisibles.

"*People* v. *Henderson,* 28 Cal., 470.

"El acusado ofreció probar que el interfecto fué un hombre violento, de carácter turbulento y sanguinario. Se excluyó la prueba,

y nosotros creemos que era procedente su exclusión. El interfecto estuvo sin armas cuando fué agredido; y el acusado se acercó a él por detrás, y mientras el interfecto estaba pacíficamente conversando con un çonocido, le disparó un tiro por la espalda, entrando la bala en su cuerpo un poco a la izquierda del espinazo casi junto al extremo inferior de la espaldilla y causándole una herida mortal; y después de haber caído al suelo, el acusado volvió a disparar otro tiro contra él, y luego disparó por tercera vez, siendo cada herida mortal, según la opinión del médico que declaró como testigo. En tales circunstancias, la reputación del interfecto como hombre de carácter pacífico o de otra índole, no es de importancia. Por mala que haya sido, el acusado no tenía derecho a matarle por ese motivo. Cuando se permite la presentación de pruebas con respecto a la mala reputación del interfecto, éstas, en unión de las circunstancias inmediatas en las cuales se cometió el homicidio, deben tender hasta cierto punto a demostrar que el acusado, como hombre razonable, tenía motivos suficientes para temer que él mismo estaba a punto de recibir de manos del interfecto un gran daño corporal, y que al matarle, obró bajo la influencia de ese temor. En el momento de realizarse el homicidio, debe ocurrir algún hecho que indique que en ese momento el inmediato propósito del interfecto con respecto al acusado, es de carácter hostil o a lo menos dudoso, y cuyo hecho pueda elucidarse por medio de la conocida reputación del interfecto si es que tenía en la comunidad la reputación de un hombre de carácter violento, etc.

"*People* v. *Edwards*, 41 Cal., 643 y 644.

"El apelante alega que el tribunal inferior excluyó pruebas propuestas por él en el sentido de que se le había dicho antes de los disparos, que el interfecto era un hombre de carácter peligroso, y que el acusado haría bien en guardarse de él; y que la exclusión de esa prueba constituía un error. El acusado afirmó y presentó pruebas tendentes a demostrar que al disparar el tiro que causó la muerte del interfecto, obró en defensa propia. En relación con las pruebas presentadas con respecto a lo que ocurrió en el momento de los disparos, era sin duda alguna, lícito para el acusado demostrar que con anterioridad a los disparos, se le había informado de que el interfecto era un hombre peligroso.

"*State* v. *Lull*, 48 Vt., 586.

"Cuando un acusado alega haber obrado en defensa propia, cualquiera prueba que tienda a demostrar que obró como una persona razonablemente prudente hubiera obrado en las mismas circunstancias,

es prueba adecuada (*People* v. *Lams,* 57 Cal., 119, 130; *People* v. *Westlake,* 62 Cal., 307).

"En dicho caso la prueba tendía a demostrar que el acusado fué acometido por el interfecto, y que en la riña que resultó de dicha agresión, el acusado disparó un tiro contra el interfecto, hiriéndole mortalmente. Al determinar si el acusado obró con la razonable prudencia y precaución, y en la sincera creencia de que se hallaba en inminente peligro de muerte o gran daño corporal, era conveniente que el jurado supiera, si esto era un hecho, que dicho acusado había sido informado de antemano, que el hombre que lo acometió era un individuo peligroso, y que el acusado así lo creyó en aquel momento; puesto que tal información y creencia podrían razonablemente influir en la conducta de un hombre prudente, en tales circunstancias. Tal prueba no descansa sobre la necesidad de demostrar que esa comunicación fué puesta en conocimiento del interfecto como afirman los abogados del apelado. El único objeto de dicha prueba es demostrar el estado de ánimo del acusado en el momento de los disparos, y para este fin era adecuada, y debió haberse admitido.

"*People* v. *Powell,* 87 Cal., 364 y 365."

Hay un caso de California resuelto posteriormente, o sea en el año 1901, en el cual, según se expresa en la nota que le sirve de epígrafe, se ha declarado que:

"Las instrucciones dadas al jurado en un juicio por asesinato, de que las pruebas con respecto al carácter del interfecto, tendentes a demostrar que era un hombre violento, pendenciero y peligroso, no se admitían como tendentes 'en manera alguna' a justificar la muerte dada al interfecto por el acusado, no eran impropias por ser modificadas por el resto de las instrucciones en el sentido de que las pruebas con respecto a la mala reputación del interfecto, habían de considerarse solamente como una circunstancia aclaratoria de los hechos ocurridos en el homicidio, y para indicar al agresor y la naturaleza de la agresión."

*People* v. *Young,* 63 Pac. Rep., 837.

En la aplicación de la ley enunciada en los casos de California, a los hechos del caso en discusión, estriba el error en que ha incurrido el tribunal sentenciador. Nadie niega los principios legales que se han invocado; pero ¿qué aplicación

tienen dichos principios a un estado de hechos que difieren en puntos esenciales de los tomados en consideración por la corte enunciando las opiniones en que esos principios se han expresado?

En cuanto al carácter y reputación del interfecto, en juicios celebrados en causas por homicidio, de una cuidadosa revisión de todas las principales decisiones de los tribunales americanos, resulta el establecimiento de los siguientes principios generales.

Ninguna persona es disculpable de haber dado muerte a otra, simplemente porque su víctima era de un genio violento, turbulento o sanguinario; y como regla general, la prueba referente a la reputación del interfecto, ya sea buena o mala, no es admisible en los procedimientos seguidos contra el homicida. (*State* v. *Chandler,* 5 La. Ann., 489; 52 Am. Dec., 599; *Hudson* v. *State,* 6 Tex. App., 565-32; Am. Rep., 593.)

Sin embargo, cuando se demuestra que el interfecto era una persona de carácter violento, peligroso o sanguinario, el acusado que ha sido acometido o amenazado, ciertamente puede haber tenido más razones para temer que se encontraba en peligro de muerte o de un grave daño físico, de las que hubiera tenido en el caso de que la agresión se hubiera efectuado por un hombre de conducta pacífica y tranquila; y la parte acometida o amenazada tenía derecho a tomar medidas más prontas, violentas y eficaces para su protección propia, que las que en otro caso hubiera estado justificado en adoptar. Por lo tanto, en los casos en que el homicida trata de justificar el homicidio con el motivo de defensa propia, la prueba con respecto al carácter violento, turbulento y peligroso del interfecto, es admisible como tendente a demostrar que el acusado estaba justificado en creer que estuvo en peligro de perder su vida o de sufrir un grave daño corporal, y como tendente también a explicar los actos del interfecto en el momento en que se realizó el homicidio, y porque dicha prueba se relaciona con el motivo que impulsó al acusado al homicidio. Lo único que se requiere para que tales pruebas sean ad-

misibles por los motivos expuestos, es que las declaraciones
hechas en el caso, tienden a demostrar que el interfecto fué
el agresor; y es suficiente que el elemento de defensa propia
aparezca en la prueba, aunque sea demostrado únicamente
por la declaración del mismo acusado. (*State* v. *Feely,* 3 L.
R. A. N. S., 351; *Storey* v. *State,* 71 Ala., 329; *Kapp* v. *State,*
100 Ala., 4; 46 Am. St. Rep., 17; *State* v. *Morey,* 25 Or., 241;
35 Pac., 635; 36 Pac., 573.)

Sin embargo, es necesario en tales casos, que haya habido
una demostración hostil por parte del interfecto contra el
homicida, la cual considerada en relación con la reputación del
interfecto, pudiera haber despertado en el ánimo del acusado,
la creencia de un inminente peligro de su vida o cuerpo; ha-
llándose la consideración de la reputación del interfecto, limi-
tada a determinar la significación o aparente significación del
acto o demostración manifiesta por parte de este último; aun-
que el acto o demostración pueda haber sido de tal índole que
ordinariamente hubiera sido considerada como inocente, a no
ser por la reputación del agresor; y debe primeramente pre-
sentarse pruebas con respecto a tal acto o demostración hos-
til, para que exista un motivo para la presentación de pruebas
que demuestran el carácter violento, turbulento, peligroso o
sanguinario del interfecto. (*Powell* v. *State,* 101 Ga., 9; 65
Am. St. Rep., 277; *Garner* v. *State,* 28 Fla., 113; 29 Am. St.
Rep., 232; *Morrell* v. *State,* 136 Ala., 44; 34 So. 208.)

Pero, ciertamente la reputación del interfecto por mala
que haya sido, no pudo haber tenido efecto alguno sobre la
creencia en el ánimo del acusado de que él se hallaba en peli-
gro de muerte o grave daño corporal, a menos que conociera
esa reputación. Por consiguiente, la prueba de tal conoci-
miento previo por parte del acusado, es necesaria para la ad-
misibilidad de la prueba con respecto a la reputación del inter-
fecto, y lo mismo que la prueba referente a un acto o demostra-
ción hostil, aludido anteriormente, debe ser presentada como
una base para la prueba propuesta referente a la mala repu-
tación del interfecto. (*Henderson* v. *State,* 12 Tx., 525; *Com.*

v. *Straesser,* 153 Pa., 452; 26 Atl., 17; *Dukes* v. *State,* 11 Ind., 557; 71 Am. Dec., 370.)

Ni es la ley de la defensa propia aplicable en el sentido de justificar al tribunal en considerar el carácter peligroso, violento y sanguinario del interfecto, aunque el homicidio fué cometido para salvar la vida del acusado, en los casos en que el altercado, en el cual dicho homicidio se hizo necesario, fué provocado por el homicida; y en tales casos, la prueba con respecto a la mala reputación del interfecto, no es adecuada; aunque pueda ser conveniente después de haberse establecido la culpabi'idad del acusado, considerar tales pruebas al fijar la pena que deba imponerse al homicida.

*Teague* v. *State,* 120 Ala., 309; 25 So., 209.

*Coile* v. *People,* 240 Ill., 494; 93 Am. St. Rep., 208.

*Morrison* v. *Com,* 24 Ky. L. Rep., 2493; 67 L. R. A., 529.

Así es que hablando en sentido general, se puede decir que en casos de homicidio, las pruebas referentes a la mala reputación del interfecto son admisibles solamente al tratarse de la cuestión de defensa propia del acusado. Se ha declarado directamente y repetidas veces, que tales pruebas también son admisibles cuando exista alguna duda con respecto a la naturaleza del acto constitutivo del homicidio, o referente a la cuestión de cuál de las partes haya sido el agresor; aunque tal vez el verdadero sentido de esta regla es que tales pruebas son admisibles siempre que aparezca una incertidumbre con respecto al punto de si el homicidio fué o nó cometido en defensa propia. (Véase las notas en el caso de *State* v. *Feely,* 3 L. R. A. N. S., p. 377.)

Y los tribunales de algunos Estados han declarado que tales pruebas son admisib'es con el fin de fijar el grado del homicidio y señalar la pena. Pero en otros tribunales se ha negado que las pruebas que con ese fin se presentan con respecto a la reputación, sean admisibles; sin embargo, la preponderancia de autoridades parece estar a favor de su admisibilidad. (*Fields* v. *State,* 47 Ala., 603; 11 Am. Rep., 771; *Smith* v. *State,* 88 Ala., 73; 7 So., 52.)

La clase de carácter o reputación por parte del interfecto, con respecto a la cual es admisible la prueba en casos de homicidio, debe ser de tal naturaleza que explique la conducta del interfecto en el momento de realizarse el homicidio; o que dé sentido o significado a dicha conducta; o debe tender a elucidar las circunstancias que acompañaron a la tragedia. Rasgos de carácter de otra y distinta clase no pueden demostrarse; aunque pueden presentarse pruebas con respecto a rasgos especiales de carácter en circunstancias especiales, cuando se pruebe que tales circunstancias especiales han existido en el momento de realizarse el homicidio. (Véase la nota en el caso de *State* v. *Feely,* 3 L. R. A. N. S., p. 377.)

El carácter debe ordinariamente probarse mediante la reputación general y no mediante actos específicos o la opinión de testigos. Actos específicos de mal carácter por parte del interfecto, pueden, sin embargo, ser probados cuando sean conocidos por el homicida; puesto que conociéndolos, debe haberlos tomado en consideración al resolver sobre la necesidad de dar muerte a su adversario para protegerse a sí mismo. (*Heffington* v. *State,* 41 Tx. Crim. Rep., 315; *Harrison* v. *Commonwealth,* 79 Va., 374; 52 Am. Rep., 635.)

Las personas que hayan conocido al interfecto por mucho tiempo son testigos competentes para probar su carácter; y la admisibilidad de pruebas en cuanto al carácter, es una cuestión de derecho que debe ser resuelta por el juez; pero su importancia y efecto es una cuestión de hecho que cae dentro de la esfera de acción del jurado (*Garner* v. *State,* 28 Fla., 113; 29 Am. St. Rep., 232; *State* v. *Christian,* 44 La. Ann., 950; 11 So., 589.)

Es claro a mi entender, que la razón alegada por el juez de distrito, no era suficiente para justificar la exclusión de la prueba propuesta para probar la mala reputación del interfecto; puesto que es muy posible que aunque el acusado no haya visto nunca al interfecto con anterioridad a la riña fatal, haya sabido quien era, por conocer la choza en que vivía o por otras circunstancias; y él puede muy bien haber sido in-

formado en cuanto a la reputación de que gozaba el inquilino de la referida choza, la que tenía a su cargo, como agente, aunque no haya tenido un conocimiento perfecto de su presencia personal. Por consiguiente, la cuestión no era, como parece haber sido la idea del juez sentenciador, si el acusado conocía al interfecto, sino si conocía la reputación que éste tenía como un hombre violento, turbulento o peligroso. Desde el punto de vista del juez sentenciador, con respecto a esta cuestión, los casos de California citados por él, no sostienen su resolución, y no existen otras autoridades que la sostenga, puesto que dicha resolución es claramente incorrecta, como proposición legal.

El distinguido letrado, que a nombre del apelante, presentó un alegato escrito en el presente caso, hace uso de una traducción inglesa de las notas taquígraficas tomadas en el acto del juicio, presentándolas como un apéndice a su alegato. Tales notas no forman parte de los autos en apelación, y una referencia a las mismas, como exposición de hechos, sólo tiende a hacer el alegato confuso y difícil de entender, y disminuye mucho la utilidad del mismo para el tribunal como un auxilio en la consideración del caso. Los hechos deben tomarse de la exposición regularmente preparada, firmada y certificada por el juez sentenciador; y si cualquiera parte de las notas taquigráficas ha sido omitida en la exposición del caso, se presume que esa parte fué incorrecta o de ninguna importancia. Nosotros no podemos ir más allá de la certificación del juez de distrito con respecto a cuáles fueron los hechos probados en el juicio, a no ser en casos en que se presenta un pliego de excepciones contra tal omisión, y cuyo pliego sea debidamente sostenido por declaraciones juradas, propias para ese fin.

Pero, aunque dicho juez haya alegado un motivo incorrecto para su resolución, ésta puede, sin embargo, ser correcta, al excluir la prueba propuesta referente al carácter del interfecto. Veamos pues. ¿Hubiera sido admisible, por motivo alguno, la certificación expedida por el alcaide del presidio?

No se ha citado ningún caso que sostenga la admisibilidad de semejante documento como prueba de mal carácter, ni hemos podido encontrar caso alguno de esa índole. Actos específicos por parte del interfecto, no son admisibles como prueba de su carácter, a menos que se pruebe primero que el acusado tenía conocimiento de esos actos. Semejante certificación no tiene más valor que actos específicos; y no se ha demostrado ni se ha ofrecido probar que el acusado supiera la historia penal del interfecto antes del comienzo de la riña fatal. Por consiguiente, sin ese antecedente previo, el documento no era admisible como prueba, y no hubo ningún error esencial en la resolución de la corte inferior, por la que se excluyó el citado documento como prueba.

Nosotros hemos declarado frecuentemente, de acuerdo con numerosas autoridades, que un motivo erróneo alegado por el juez sentenciador como fundamento de una decisión esencialmente correcta, no invalida la sentencia, y no es excusa para su revocación.

Habiendo resuelto la cuestión preliminar, procederé ahora a las cuestiones principales envueltas en la decisión de este caso y la revisión de la sentencia condenatoria dictada en la corte inferior.

Hace más de ocho años que la Legislatura de Puerto Rico, para la mejor administración de justicia, aprobó una ley, cuyo artículo principal, copiado a continuación, dice lo siguiente:

"Sección 1.—Que el Tribunal Supremo de Puerto Rico constituirá de aquí en adelante un tribunal de apelación y nó un tribunal de casación. En sus deliberaciones y fallos en todos los asuntos, tanto en lo civil como en lo criminal, dicho tribunal no se limitará solamente a infracciones de ley o quebrantamientos de forma, según fueren señalados, alegados o salvados por los litigantes, o según se hiciera constar en sus exposiciones y excepciones sino que con el más alto fin de justicia, el tribunal puede también entender en todos los hechos y tramitaciones en la causa tal como aparecieren en autos, considerando en igual forma sus méritos para la mejor administración de justicia y del derecho, y evitar injusticias y demoras.

"Leyes de la Asamblea Legislativa de Puerto Rico, 1903, pp. 58 y 59."

Esta ley claramente confiere al Tribunal Supremo el derecho de revisar los hechos en cada caso juzgado por la corte inferior, tanto en lo civil como en lo criminal; aún más, es el deber de este tribunal de hacer eso. Y a menos que esté convenido de que el tribunal sentenciador ha logrado hacer justicia, no debe permitirse que subsista sentencia alguna sin ser revocada. Yo temo que, quizás, de vez en cuando en la multitud de asuntos oficiales que reclaman con urgencia nuestra atención, no hagamos debidamente caso de los deberes que esta ley nos impone. Pero, por lo que a mí se refiere, diré que nunca confirmaré, a sabiendas, ninguna sentencia en que se haya hecho la menor injusticia a cualquiera de las partes; y mucho menos permitiré que persona alguna sea privada de su libertad o de su vida a consecuencia de un error de derecho o de hecho, si está en mi poder el evitarlo. Creyendo que es mi deber analizar cuidadosamente tanto la ley como los hechos del presente caso, procederé al cumplimiento de ese deber con la mayor energía y fuerza intelectual que tenga a mi disposición.

Toda vez que el juez que conoció de este pleito en la corte inferior, es ahora miembro de nuestro Tribunal Supremo, puede sentirse una vacilación natural en criticar adversamente sus resoluciones y opiniones; pero tales consideraciones deben dejarse a un lado cuando obstruyen la senda del deber como lo hacen en el presente caso. Así es que, con el mayor respeto hacia mi compañero, continúo.

Puesto que ésta es una cuestión importante en este caso, examinemos, a lo menos brevemente, la ley americana referente a la cuestión de defensa propia. Wharton dice que la ley permite a una parte a quien se trata de hacer un grave daño, resistir a tal tentativa aún a riesgo de la vida del agresor. La defensa propia ha sido caracterizada frecuentemente como un derecho conferido por Dios; porque trae su origen

de la ley de la naturaleza y es, por lo tanto, independiente de
las leyes humanas. Pero el ejercicio de ese derecho debe nece-
sariamente regularse por los códigos adoptados para el go-
bierno de hombres que viven juntos en un estado de sociedad,
y que dependen más o menos los unos de los otros. Debemos,
por lo tanto, examinar y considerar las leyes y las decisiones
de los tribunales en los casos que surjan con sujeción a las
mismas, al determinar la aplicación de los principios de de-
fensa propia á determinado estado de hechos.

En la resolución de este caso, es importante determinar si
el tribunal sentenciador miró desde el verdadero punto de
vista la doctrina de la defensa propia en la admisión y exclu-
sión de pruebas, y en la apreciación o consideración de dichas
pruebas, después de haberlas admitido. En los casos en que
las pruebas son contradictorias, esta corte frecuentemente se
ha negado a revisar la decisión del tribunal sentenciador o
del jurado, con respecto a la credibilidad de los testigos, y la
importancia que debe darse a sus declaraciones, a no ser en
circunstancias especiales. Pero la aplicación de reglas le-
gales y la consideración de hechos admitidos y la relación
de la ley con las pruebas en el caso de que se trate, no caen
dentro de este principio; y siempre se ha considerado que
estas materias pueden propiamente ser objeto de una revisión
por el tribunal de apelación. Cuáles son los hechos que excu-
san o justifican un homicidio, es una cuestión de derecho que
debe ser resuelta en primer término por el tribunal sentencia-
dor. Qué es lo que constituye una muerte legal o ilegal dada
a un ser humano, es una cuestión de erudición técnica y legal,
la cual, cuando se presente un caso al jurado, debe ser definida
por el tribunal, en sus instrucciones; y no es una cuestión de
hecho que debe dejarse al jurado para su decisión. (*Harbour
v. State,* 140 Ala., 103; 37 So. Rep., 330; *Gladden v. State,*
12 Fla., 562.)

Hay que tener presente que incumbe al tribunal decir
cuáles son las reglas de derecho, y al jurado, determinar si en
el caso concreto que se halle bajo consideración, han existido

hechos que excusen o justifiquen el homicidio. (*Pinder* v. *State*, 27 Fla., 370; 26 Am. St. Rep., 75; 8 So. Rep., 837.) Está estrictamente dentro de las atribuciones del tribunal sentenciador, determinar si las pruebas eran suficientes para establecer una justificación legal fundada en la defensa propia; y cuando la causa es juzgada ante un jurado, la determinación del tribunal con respecto a este punto, debe exponerse en sus instrucciones. (*Franklin* v. *State*, Tex. Crim. App., 88; S. W. Rep., 357; *State* v. *O'Neil*, 58 Minn., 478; 59 N. W., 1101.) Se ha declarado que aunque en una causa criminal seguida por homicidio, aparezcan, en los autos, pruebas con respecto a defensa propia, esto no justificará a un tribunal de apelación en alterar el veredicto del jurado por el que se declare al acusado culpable de un delito de homicidio, a no ser que resulte claramente de los autos, que la declaración de culpabilidad fué contraria a todas las pruebas. (*People* v. *Boling*, 83 Cal., 380; 23 Pac. Rep., 421.) Cuando en algún juicio surge una cuestión de defensa propia, el acusado tiene derecho a que la ley referente a esta materia, sea explicada correcta y completamente al jurado, en todas las fases en que pudiera ser aplicable a los hechos establecidos por las pruebas. (*King* v. *State*, 13 Tex. App., 277; *Bell* v. *State*, 17 Tex., App., 538.)

Y cuando los hechos que aparezcan de la prueba, autorizan al tribunal para dar al jurado instrucciones con respecto a la provocación de un altercado, dicho tribunal debe indicar, conforme a la prueba, el acto que constituya la provocación y definir sus efectos sobre el caso de que se trata, y la relación que tenga con el mismo, debiendo la corte asimismo explicar hasta qué punto semejante acto limitaría o disminuiría el derecho de defensa propia, de modo que el jurado no se vea en el caso de hacer conjeturas en cuanto a la naturaleza y calidad de dicho acto, o con respecto al grado de la limitación y disminución que semejante acto produciría en cuanto a los derechos del acusado. (*Morgan* v. *State*, 34 Tex. Crim. Rep., 222, 29 S. W. Rep., 1092; *Johnson* v. *State*, 141 Ala., 37; 37

So. Rep., 456.)   Si en vista de los hechos, el jurado puede
razonab'emente llegar a la inferencia de defensa propia (por
parte del acusado), entonces es errónea la instrucción, de que
si ellos dan crédito a las pruebas del acusado, éste sería cul-
pable, a lo menos de homicidio, por excluir tal instrucción
toda idea de defensa propia. (*State* v. *Hough,* 138 N. C., 663;
50 S. E. Rep., 709.)   En un proceso por homicidio, la cuestión
de si dicho delito era o nó justificable o excusab'e por el fun-
damento de defensa propia debe ser sometida al jurado y si
las pruebas con respecto al delito de referencia, son contra-
dictorias, la importancia y credibilidad de las mismas, son
cuestiones que deben ser resueltas por el jurado. (*Kipley* v.
*People,* 215 Ill., 358;  74 N. E. Rep., 379;  *Martin* v. *State,* 17
Ohio C. C., 406;  *State* v. *Turner,* 29 S. C., 34;  13 Am. St.
Rep., 706;  6 S. E. Rep., 891;  *People* v. *Grimes,* 132 Cal., 30;
64 Pac., 101;  *North* v. *People,* 139 Ill., 81;  28 N. E. Rep.,
966;  *Pridgen* v. *State,* 31 Tex., 421.)

Cuando la prueba tenga la tendencia de demostrar que el
homicidio fué cometido en defensa propia, entonces la impor-
tancia de dicha prueba debe ser resuelta por el jurado, y no
puede ser excluída de su consideración, por leve que fuere esa
tendencia. (*Armsworthy* v. *State,* Tex. Crim. App., 88, S. W.
Rep., 215;  *Morris* v. *State,* Ala., 39, So. Rep. 608.)   Deben
darse al jurado instrucciones con respecto a defensa propia,
siempre que exista cualquiera prueba en cuanto a defensa
propia. (*Territory* v. *Watson,* N. M., 78 Pac. Rep., 504.)   Y
todos los hechos y circunstancias que rodean al caso de que se
trate, deben ser tomados en consideración por el jurado, al
determinar si el homicidio fué cometido en defensa propia o
por otro motivo. (*Sullivan* v. *State,* Miss., 32 So. Rep., 2;
*Bird* v. *United States,* 187 U. S., 118.)

Del mismo modo son los jurados los únicos jueces en
cuanto al grado de fuerza que una persona agredida pueda
emplear para evitar violencia y daño a sí misma. (*Coleman*
v. *State,* Tex. Crim. App., 90 S. W. Rep., 499;  *Hulse* v. *Toll-
man,* 49 Ill., App., 490;  *State* v. *Stockton,* 61 Mo., 382.)   Y es

una cuestión que debe resolver el jurado, si según las pruebas, el acusado tenía o nó a la mano, y aparente, para su comprensión como hombre razonable, los medios para evitar la muerte del interfecto, sin exponerse al peligro inminente de perder su propia vida o de sufrir un gran daño corporal. (*People* v. *González*, 71 Cal., 579; 12 Pac. Rep., 783.)

Pero incumbe exclusivamente al jurado, resolver en su totalidad la cuestión de culpabilidad o justificación tomando en consideración todas las circunstancias que rodeen el caso; y la instrucción del tribunal sentenciador por la que se singularice determinado acto del interfecto, o instruye al jurado que dicho acto no puede ser invocado al considerar la cuestión de defensa propia, es una invasión de su esfera de acción, y es necesariamente errónea. (*Elland* v. *State*, 52 Ala., 322.) Incumbe al jurado determinar si los actos del acusado durante la riña fatal, fueron de tal índole que podían provocar un altercado, y si realmente lo provocaron, y esto debe determinarse en vista de todas las pruebas. (*Logsdon* v. *Com.*, 19 Ky. L. Rep., 413; 40 S. W. Rep., 775; *Baldwin* v. *State*, 111 Ala., 11; 20 So. Rep., 528; *State* v. *Hatch*, 57 Kan., 420; 57 Am. St. Rep., 337; 46 Pac. Rep., 708.).

Y en todos los casos en que surge una cuestión con respecto a cuál de las partes provocó el altercado, el tribunal debe exponer al jurado las circunstancias indicadas por las pruebas que den origen a tal cuestión. (*Mozee* v. *State*, Tex. Crim. App., 51, S. W. Rep., 250.)

Y cuando se desarrolla una contradicción entre las pruebas, incumbe exclusivamente al jurado, determinar qué serie de declaraciones han de creer; y cualquiera que fuere la desigualdad de números, o cualquiera que fuere la reputación de los testigos contrarios, a la corte no se le ha confiado el deber de resolver la cuestión de hechos así controvertida. (*Eby* v. *State*, Ind., 74., N. E. Rep., 890; *Gibson* v. *State*, 91 Ala., 64; 9 So. Rep., 171.) Tampoco debe la corte suponer cuando exista una cuestión en cuanto a qué parte sea la que

haya procedido mal, que una u otra de las partes haya tenido primero o principalmente la culpa.

'(Véanse los casos·de Hatch y Gibson citados anteriormente.)

Por consiguiente, es una cuestión que debe resolver el jurado con arreglo a los hechos que resultaren probados por las pruebas, si el homicidio fué un asesinato cometido a sangre fría, un caso de combate mutuo, o un caso de defensa propia. (*Koller* v. *State,* 36 Tex. Crim. Rep., 496; 38 S. W. Rep., 44; *Hellard* v. *Com.,* 27 Ky. L. Rep., 115; 84 S. W. Rep., 329.) Es también una cuestión que debe resolver el jurado, si las circunstancias del altercado durante el cual ocurrió el homicidio, fueron de tal índole que justifiquen la alegación de defensa propia al considerarse esta última por si sola, sin referencia a hechos ocurridos anteriormente. (*Bolzer* v. *People,* 129 Ill., 112; 4 L. R. A., 579.)

Al revisar una causa que haya sido juzgada por el juez sólo, y sin jurado, debemos distinguir cuidadosamente entre las materias de que pueda conocer en su carácter de juez, y los hechos que sean sometidos a su consideración durante el cumplimiento de un deber que ordinariamente incumbe al jurado. Todas las cuestiones resueltas por el juez, como tal, por ser cuestiones de derecho, están claramente sujetas a la revisión del tribunal de apelación; pero cuando el juez sentenciador desempeña las funciones de un jurado, aquilatando y reconciliando las declaraciones contradictorias de testigos en casos dudosos, la corte de apelación a veces se niega a intervenir, excepto cuando la decisión parece haber sido dictada bajo la influencia de parcialidad, apasionamiento o prevención, o a consecuencia de un error evidente; o cuando parece haber causado una injusticia manifiesta. En casos como este último, la corte de apelación no vacilará en intervenir a favor de la justicia y de corregir cualquier injusticia que se haya cometido.

Examinemos, pues la apreciación de la prueba, según se dice en Puerto Rico, o seá la importancia dada por el juez a la

prueba. El juez sentenciador no parece haber prestado atención alguna al hecho, que no ha sido controvertido, de que Rosa era un hombre más alto y más fuerte que Sutton, y que era un adversario peligroso aún estando sin armas. También determinó dicho juez que las heridas o rasguños que en número de cinco, se encontraron en el cuerpo de Sutton, habían sido causados por las púas de los alambres de la cerca, por debajo de la cual se supone que haya cruzado al retirarse del campo de combate. El juez funda esta opinión en la declaración de María Rodríguez, y en una inspección de la misma ropa. Nosotros no hemos podido inspeccionar dicha ropa, y la declaración de María Rodríguez no es satisfactoria. Ella fija la fecha del incidente en mayo en vez de marzo. Puede ser que Sutton haya pasado por frente a su casa en el mes de mayo, según ella declaró, y que haya pasado por debajo de los alambres, bajando para ello la cabeza. Aunque había nada menos que cinco testigos que presenciaron lo ocurrido, ninguno de ellos corrobora la declaración de María Rodríguez, y ni uno sólo de dichos testigos vió a Sutton pasar por debajo de los alambres. No había motivo para que Sutton cruzara o pasara por cerca alguna al retirarse de la escena del combate para ir a su propia casa, puesto que las calles estaban abiertas y nadie lo perseguía. Si el Dr. Fosas dijo la verdad, y él es un hombre inteligente, y se presume que es un testigo verídico, entonces no *todos* los rasguños que se encontraban en el cuerpo de Sutton, pudieron haber sido causados por las púas de los alambres de la cerca. Dicho doctor declara que las heridas en los muslos no pudieron ser hechas de ese modo, y si dichas heridas no fueron causadas de ese modo, entonces Rosa debe haber estado armado, y debe haberlas inferido con un arma. Y ¿qué es más razonable que el que Rosa haya tenido un machete? No lleva todo agricultor en esta Isla siempre un machete? Sutton dice que vió un machete en sus manos. Y ¿saldría un hombre para sembrar yautías y sacar yucas, sin ninguna clase de herramienta? Decir que las sacaba con las manos, es increíble. Por consiguiente,

las declaraciones negativas de los amigos y parientes del
interfecto, en el sentido de que ellos *no vieron* arma alguna,
no deben prevalecer sobre la declaración positiva de Sutton
que fué corroborada por las heridas encontradas en su cuerpo
por el médico que declaró. El acusado declara que el inter-
fecto estaba armado.

Para comprender a fondo los hechos del presente caso,
reproduciremos en toda su extensión las declaraciones hechas
por los diferentes testigos, según han sido consignados en la

### EXPOSICIÓN DEL CASO.

"El día 11 de diciembre de 1908, se celebró el juicio de esta
causa, compareciendo el Fiscal y el acusado con su abogado
en representación de las respectivas partes. El Fiscal pre-
sentó su prueba, consistente en una certificación de la muerte
de José Rosa, expedido por el encargado del Registro Civil de
Bayamón, cuyo documento fué admitido por la corte previa la
conformidad del acusado.

"En seguida presentó el Fiscal la siguiente prueba testi-
fical llamando a varios testigos.

"1°. Flora Rosa declaró que vive en el barrio de "Vista
Alegre" de Bayamón; tiene su marido y un hijo, y es her-
mana de José Rosa que murió de un tiro que le pegó el acu-
sado, ocurriendo el hecho así: el hermano de la declarante,
José Rosa, llegó de la calle y mandó a la declarante a coger
unos gandules, saliendo él a sacar unas yucas; y cuando las
sacaba, llegó el americano y le habló y enseguida en ese mis-
mo momento, oyó la declarante el tiro, y corrió hacia su her-
mano, el cual estaba ya muerto; y el americano se fué con el
revólver en la mano. También estaba allí la hija mayor del
muerto, y la declarante vió al viejo Bartolo, y no había más
nadie. Su hermano cayó boca abajo, no dijo una palabra, y
murió allí mismo.

"Preguntada por el abogado del acusado, dice que su her-
mano arrancaba la yuca con las manos porque la tierra era

arena, y no tenía cuchillo; no vió llegar al americano sino cuando ya estaba hab'ando con su hermano, y hablaban ni alto ni bajo; la declarante estaría como a media cuerda de distancia; oía el ruido de la voz pero no las palabras; cuando la declarante sintió el tiro, miró hacia donde estaba su hermano, y le vió caer, y al americano correr; estaban allí en aque¹ momento, la declarante, la hija del muerto, y nadie más.

"Preguntada por el juez, dice que las matas de donde cogía los gandules, eran grandecitas, y no le dejaban ver muy bien a su hermano, estando esas matas entre ella y el sitio en que estaba su hermano, quien estaba sólo cogiendo esas yucas; no se dió cuenta de la llegada del americano, sino cuando estaba hablando con su hermano, y siguió cogiendo sus gandu'es y no tardó mucho en sonar el tiro, y enseguida cayó en tierra su hermano, boca abajo, y llegó la declarante y no tenía nada en sus manos ni alrededor, sino sólo las yucas. El americano a que se refiere, es el acusado.

"2°. Juana Rivera declaró que ella es la madre de la mujer de José Rosa, en cuya casa estaba la declarante, asistiendo a su hija de parto; José Rosa vivía en la finca de Mr. Sutton, en un pedazo de terreno que le tenía arrendado; y en una casita que había allí, vivían todos; el día del suceso, estaba José Rosa sembrando unas yautías, y después fué a sacar un pie de yuca para desayunar la familia; y l'egó el acusado y puso el pie alante y le dió una gaznatada a José Rosa, el cual le puso la mano en la cintura, y entonces el americano le disparó un tiro y lo mató, muriendo en el acto José Rosa, y el americano se fué con el revólver en la mano: José Rosa se fué encima del americano, amagándole y metiéndole las manos; cuando le metió las manos, el americano le pegó el tiro.

"Preguntada por el abogado, dice que e'la estaba en la casa de José Rosa, en la cocina, y por un agujero de la cocina que es de yagua, vió cuando el americano hablaba con José; y la declarante salió afuera y vió a su hijo político que caía, y al americano que corría; y la declarante gritó y corrió la gente. La hermana de José, y una chiquita estaban más abajo

de la casa, y también había otra chiquita, estando las dos con su tía Flora Rosa, las cuales, al sonar el tiro, corrieron. José Rosa y el acusado sólo tuvieron dos palabras, y no hubo lucha entre ellos. José Rosa sacaba las yucas con la mano, y para trabajar, usaba de una azada, la cual dejó cerca de las yautías.

"A preguntas del juez, dice que la cocina está cercada de yaguas viejas, y sólo tenía la puérta de entrada, pero sin hojas; y allí estaba la declarante cuando el acusado le habló a José Rosa, y al oir la voz del americano, salió la declarante al batey; hablaron dos palabras que no oyó la declarante, y cuando el americano le dirigió la palabra, José Rosa se enderezó y el americano le tiró una gaznatada; entonces José le puso las manos en la cintura al americano, y éste le disparó un tiro, corriendo para acá José, y cayendo. Desde el sitio en que estaban Flora y las chiquitas, cogiendo gandules, no podían ver a José Rosa, porque estaba al respaldo.

"3º. Bartolo Arroyo declaró que vive en la misma finca, y el 11 de marzo de 1908, llegó a su casa a eso de las tres de la tarde, que está como a veinte varas de la casa de José Rosa; y cuando el declarante pasó por ella, estaba él con una chiquita, arrancando una mata de yuca, y llegando el declarante a su casa, oyó que hablaba José Rosa, y se asomó el declarante por la ventana de su casa, vió llegar a Mr. Sutton y le dijo en voz baja una cosa a José Rosa, y al encontrarle éste, el americano le tiró un jinquetazo a José, éste jaló para atrás, el americano metió la mano en el seno, José saltó a empuñarlo, y el declarante se tiró corriendo, y al llegar encima de ellos, reventó el tiro, y cayó Rosa entre dos tocones. Rosa fué el que saltó a empuñar al americano; el americano se fué corriendo, con el revólver en la mano, después del tiro.

"(Examina un revólver que le pone de manifiesto el Fiscal y dice que así era el que tenía el acusado).

"Preguntado por el abogado, dice que José Rosa estaba en cuatro pies, agarrado del acusado, para no dejarle sacar el revólver; el americano tenía una mano fuera y otra dentro del seno, que era donde tenía el revólver; los dos estaban en

cuatro pies, y José Rosa, con sus dos manos, tenía cogido al americano por los brazos. José Rosa sacaba unas yucas con la mano; no tenía armas, y cerca de sí, no había cuchillos ni nada. Allí estaba Flora Rosa y una chiquita, hija del muerto, y Juana Rivera en el fogón, haciendo un caldo; lo cual sabe el declarante, porque ella se sacó un grito.

"(Este testigo reproduce gráficamente, *ante el jurado,* su declaración, explicando la forma como los hechos ocurrieron, tomando al acusado, y agarrándose con él de la manera que lo vió con José Rosa.)

"4º. José González declaró que vivía el 11 de marzo de 1908, en el mismo sitio de José Rosa que es una finca a cargo de Mr. Sutton, volteando la finca a pie, y vió cuando el americano se encontró con José Rosa, agarrándose los dos, tirando José para su casa, y el otro para otro lado; en medio de la lucha, el americano jaló por su revólver y le pegó un tiro a José, quien cayó muerte, yéndose el americano corriendo para su casa. La finca está dividida por una calle, y en la boca de ésta, hay un alambre, y en el otro lado hay otro. No reparó si José tenía algún cuchillo.

"(Preguntado por el abogado, dice que el acusado tenía el revólver dentro del seno de la pretina del pantalón, y lo sacó y pegó el tiro.)

"5º. El Dr. Manuel Fosas ejerce su profesión en Bayamón, y el 11 de marzo último, le hizo la autopsia a José Rosa, que murió por una hemorragia de una herida de bala que le atravesó el corazón y los pulmones, cuya muerte debió ser en el acto.

"Terminada la prueba del Sr. Fiscal, comenzó la prueba de la defensa.

"1º. El Dr. Manuel Fosas continuó declarando como testigo de la defensa, y dice que en ese día de referencia, del Sr. Fiscal, vió al acusado como a las cinco de la tarde, observando varias heridas que tenía, superficiales, como arañazos, hechas con un instrumento poco cortante: algunas heridas están llenas de tierra y cree que esa tierra háyase producido al

caer en tierra después de estar herido el acusado o porque el arma con que fué herido estuviese llena de tierra; en dos o tres heridas observó el declarante que había tierra dentro de ellas: han podido ocasionarse con un instrumento poco cortante, como un mocho. Las heridas correspondían a las ropas que tenía puestas el acusado.

"El testigo, a preguntas del abogado, dice que esas ropas eran las que tenía puestas el acusado el día del suceso, y en la camisa hay un agujero como si fuera de bala, y una quemadura que corresponde al agujero. El acusado tenía cinco heridas, unas en el costado y en los muslos, y otras en la espalda, correspondiendo con las de las ropas.

"Preguntado por el Fiscal, dice que tales heridas de la espalda pudieron ser hechas por un alambre de púa, pero no así las del muslo; que los desgarres de la camisa pudieron ser hechos por alambre, y también pudieron ser hechos en lucha con otro individuo.

"Vuelto a preguntar por el acusado mediante su abogado, dice que las heridas de detrás pudieron ser hechas por alambre o por un cuchillo de poco corte.

"Preguntado por el juez, dice que reconoció al acusado en el pueblo a las cinco de la tarde, estando distante de la finca como unos diez minutos. Las heridas eran superficiales e irregulares, tenían desgarres, y pudieron ser hechas con un cuchillo o arma poco afilada que cortó también las ropas; pero haciendo fuerza; dichas heridas pudieron ocasionarse con un cuchillo no afilado; pero, para cortar la tela que tiene la ropa, tiene que ser por un hombre de fuerza. Que el corte que hay en la pierna derecha del pantalón, puede producirla tanto un cuchillo afilado, como un machete, un espadín, una hoja de sable o un cuchillo de mesa, y el arma haber hecho fuerza en diferentes direcciones.

"2°. D. A. Skinner, declaró que es Sub-Secretario de Puerto Rico, conoce al acusado desde 1901, como hombre de buena conducta, sin que haya intervenido en peleas o riñas; tiene

muy buen concepto moral del acusado, el cual se dedica a su trabajo.

"Preguntado por el Fiscal, dice que conoció al acusado primero en Ponce, y que es amigo de él, y le considera como un caballero.

"3°. Ezequiel Mongil, declaró que es Jefe de la Policía de Bayamón; en marzo último, y en días de autos estaba el declarante en su oficina, y se presentó un negro, diciendo que habían matado a su compadre José; fué al sitio, en unión del Juez, y encontró a José Rosa en el suelo, y a Mr. Sutton retirado de él, al que ya había arrestado la policía, ocupándole un revólver. Allí había mucha gente, comentando el hecho: el declarante ordenó que llevaran al acusado al pueblo, y el muerto al cementerio; y cuando llegaron al pueblo, pasó por allí el Dr. Fosas, o sea por el cuartel de la policía; el declarante lo llamó, y entró, reconociendo al acusado, para lo cual lo hizo desvestir; el declarante vió que el acusado tenía varios rasguños.

"Preguntado por el fiscal, no recuerda como estaba vestido el acusado; pero estaba en traje de faena lleno de tierra, y con las manos sucias.

"4°. Césaro Fernández, declaró que conoce al acusado, y conoció a José Rosa, y los vió el día de la cuestión. El declarante limpiaba su finca, y el acusado pasó por detrás suyo y le saludó, estando ocupado en limpiar una caña. Sintió una bulla y vió a unos morenos, que eran tres, peleando contra el acusado; al principio, el declarante no conocía quien era, porque estaba en el medio escondido, y en eso lo empujaron, y sacó una pierna para atrás, y por el pantalón conoció el declarante que era el acusado; y sintió un tiro, y el que tenía sujeto al acusado, lo soltó y anduvo en paso largo y se cayó, y los demás salieron huyendo; entonces el acusado echó a correr con la camisa rota y los trapos guindando.

"Preguntado por el fiscal, dice que estaba distante del sitio del suceso, y entre el declarante y ese sitio, había unos pies de caña que estaba de corte para moler, y por encima

de las cañas podía ver el declarante: las cañas y los que luchaban, estaban en un llano, y eran muchas y eran del declarante que las había comprado a una señora: por allí había algunas casas, y una era de José Rosa, y otra de Bartolo Arroyo, estando la primera un poco distante del grupo de la cuestión, y más cerca la segunda: José Rosa era el que tenía empuñado al acusado, y los demás estaban agrupados, siendo uno de ellos Bartolo: a los demás no los conocía el declarante, porque hace poco tiempo que vive allí.

"Preguntado por el fiscal, dice que Arroyo no luchaba con el acusado, pero estaban todos juntos; que cortó la caña un mes después: vió la cuestión por encima de su caña, y conoció al acusado por un pantalón amarillo, porque antes había pasado por el lado del declarante.

"5°. Jesús Pérez Martínez, declaró que conoció a Rosa y conoce al acusado, y el primero tenía un pedazo de terreno y una casita en la finca del "Quinto" que administra el acusado, había plantaciones hechas por José Rosa, pero fuera del terreno que tenía arrendado y no le pertenecía, lo cual sabe el declarante porque era el cobrador de la finca: supo el suceso media hora después, vió el sitio donde cayó Rosa que estaba fuera del terreno que le pertenecía, conoce el sitio en que Rosa sacaba yucas antes del suceso, que estaba también fuera de su sitio arrendado.

"Preguntado por el fiscal, dice que Rosa pagaba puntualmente su arrendamiento, no sabe de quien eran las yucas, había allí gandules de matas grandes.

"6°. José Eraso, declaró que estaba picando caña en la finca, cuando ocurrió el suceso, el cual no presenció; y Mr. Sutton, a cuyas órdenes trabajaba el declarante, lo mandó a buscar la policía como a las tres de la tarde, diciendo que estaba herido.

"Preguntado por el fiscal, dice que el acusado estaba al pie de su casa, y no reparó como estaba vestido, porque el acusado le mandó a buscar la policía porque estaba herido, y fué a buscarla.

"Preguntado por el juez, dice que la policía vino con el teniente.

"7º. George Sutton dice que el día del suceso volteaba la finca, y al pasar cerca de donde vivía José Rosa, lo vió trabajando en la tierra, y vió dos individuos más conversando, a los cuales preguntó que ¿quién siembra? contestándole uno de ellos "yo," preguntándole su nombre, respondió "José Rosa"; le preguntó que dónde vivía, contestándole "yo vivo ahí," señalando una casita que estaba a unas varas de distancia: le preguntó que cuándo iba a pagar la renta del terreno que ocupaba, y contestó que no debía nada; el declarante le replicó que debía una cuerda desde agosto, y respondió que no pagaba ni un centavo: el declarante le dijo que tenía que dejar la siembra, y que era la primera vez que los encontraba; pero que la había dejado varias razones en su casa, José Rosa le dijo que era mentira, porque nada había dicho en su casa; el declarante insistió en que le había dejado tales razones, y que él sabía que todo el que sembraba, debía pagar cincuenta centavos por cuerda: Rosa le contestó ¡Carajo, es mentira! y, al mismo tiempo, avanzó un paso, dándole con la mano; el declarante se defendió, y sintió un puntazo en la mano derecha, y vió sangre, siguió luchando con Rosa para agarrarle la mano, y cuando se la cogió, otro individuo le agarró por detrás, y sintió un golpe de puño en la cabeza: el declarante metió la mano dentro de la camisa para sacar el revólver, y el tercer individuo le cogió por la cintura, aguantándole el brazo derecho, por lo cual no podía sacar el revólver; seguía teniendo sujeto al José Rosa, el cual le estaba dando golpes, y así estuvieron agarrados los cuatro: el declarante sintió un tajo en un pié, y levantando el cañón del revólver, disparó un tiro por debajo de la camisa; porque ya ha dicho que el brazo se lo tenía sujeto el otro individuo, que se llama José González, y disparó un tiro, en seguida lo soltaron todos, José Rosa anduvo unos quince o veinte pasos hacia su casa, y cayó boca abajo: entonces el declarante corrió para su casa, llamó al peón, José Eraso, para que buscara a

la policía, porque estaba herido: cuando disparó el revólver, lo tenía al lado izquierdo, y así disparó; y le tenían agarrado dos individuos, sin poder precisar si también lo tenían sujeto; vió en la mano de José Rosa un pedazo de machete, y era más alto y más fuerte que el declarante: entregó el revólver a la policía: las heridas y los arañazos que el declarante tenía en su cuerpo, se los causó en la lucha José Rosa: después de la cuestión, el declarante no pasó por debajo de ningún alambre, y por eso puede asegurar que los arañazos no fueron de alambre ni de ningún cuerpo extraño, sino que se los causó Rosa.

"Preguntado por el Fiscal, dice que salió á la carretera por un sitio que llaman el "Cachete," el cual tiene un lado cercado, el declarante estaba dentro de la finca y por ella salió por una calle que llaman del "Cachete," a la carretera; no pasó por debajo del alambre: conoce a María Rodríguez que vive en la calle de Comerío, cerca del sitio, y entonces vivía dentro del "Cachete."

"A preguntas del juez, dice que la cerca es de alambre de púas y de malla.

"De este modo terminó la prueba de la defensa; entonces el Fiscal propuso prueba de refutación, que fué admitida.

"1°. María Rodríguez declaró que el once de marzo último vivía en el "Cachete," y había varios vecinos, entre ellos José Rosa, que vivía más lejos; y ese día vió pasar al acusado por el corral de su casa, con revólver en la mano, por los alambres, bajando la cabeza: que hay allí tres alambres de púas, dos caídos en el suelo, y otro bien puesto, en alto: que al pasar el acusado, se le desprendió un pedazo de la ropa por detrás, sin fijarse si era por la espalda, quedándose el pedazo en el alambre.

"A preguntas del abogado, dice que eso lo hizo llegar a oídos del Fiscal, porque la detective preguntó a la declarante, si había visto algo, y ella le contestó que había visto pasar por los alambres a Mr. Sutton, con el revólver en la mano: que cuando le preguntó eso la detective, no estaba presente Mr. Sutton, y no puede precisar la fecha en que le tomaron esa

declaración; pero, que la fecha en que la declarante vió pasar al acusado dicen que fué el once de mayo, y sostiene que en ese día, once de mayo, fué que vió pasar por el corral de su casa a Mr. Sutton.

"A preguntas del juez, dice que le dijeron a la declarante que Mr. Sutton había muerto a Rosa en ese día que le vió pasar por el alambre."

Lo anterior es una fiel exposición del caso en su totalidad, y debe, desde luego, ser considerada por nosotros, como abarcando todos los hechos esenciales. Puesto que dicha exposición fué aprobada por el juez sentenciador, debemos considerarla como auténtica. Si la misma es errónea, cualesquiera errores que en la opinión del letrado defensor hayan sido cometidos, hubieran podido señalarse mediante un pliego de excepciones debidamente firmado; y si el juez sentenciador se hubiese negado a firmar dicho pliego, el letrado hubiese podido presentar las firmas de personas presentes en aquel acto, sosteniéndose dichas firmas mediante las declaraciones juradas de los firmantes. Esa es la práctica que procede en tales casos.

Considerando cuidadosamente todos los hechos y circunstancias demostrados por los autos, ¿puede decir esta corte, que este acusado haya tenido un juicio justo e imparcial? ¿Cuál hubiera sido el fallo de un juez americano, en los Estados de Tennessee, Kentucky, Illinois o Alabama, o en cualquiera parte del continente, en semejante caso? ¿Cuál habría sido el veredicto de un jurado puertorriqueño, en vista de los hechos, según los han presentado a nosotros en estos autos? ¿Es que un hombre, cuando se ve acometido en sus propios terrenos, y en peligro de recibir a lo menos una tremenda paliza, no ha de tener el derecho de repeler fuerza con fuerza, y de protegerse contra un daño por todos los medios necesarios?

Consideremos con relación a esta cuestión, de un modo justo e imparcial, la narración hecha por el mismo acusado cuando declaró como testigo. Puede ser que su declaración merezca absoluto crédito a pesar de que él fué el acusado y

se le juzgaba ante una corte en la cual se seguían los procedimientos en un idioma que era desconocido para él; y de los cuales procedimientos dependía su libertad. Mientras él era el acusado, debe tenerse presente que la mayoría de los testigos de cargo eran parientes y amigos del interfecto, y todos ellos eran miembros de su raza y nación. Puede ser que haya existido, quizás en diferentes grados, prejuicio o prevención por parte de los testigos a favor de una u otra de las partes o de ambas. Examinemos, pues, las pruebas detalladamente.

Para analizar más eficazmente los hechos del presente caso, es conveniente que revisemos las partes esenciales de las pruebas, haciendo un resumen de las mismas.

*Algunos de los hechos no han sido controvertidos,* y son los siguientes:

José Rosa está muerto. El fué muerto el día 11 de marzo de 1908, en Bayamón, por un tiro de revólver disparado por George Sutton. En el momento de disparar el tiro, el acusado tenía el revólver en la mano debajo de la camisa, y la bala le pasó la camisa del acusado, quemándola, y entró en el cuerpo del interfecto atravesándole el corazón y los pulmones. La muerte de Rosa se produjo casi instantáneamente después de haber caminado éste una distancia de unos quince o veinte pasos. Los dos hombres nunca se habían visto antes de aquella mañana; y Rosa era desconocido de Sutton, no sabiendo éste último su nombre. Rosa vivía en una casita en la finca llamada la "Quinta," que estaba a cargo de Sutton, como administrador. Dichas partes tenían una conversación en un tono de voz ordinario, con respecto al alquiler de dicha finca. Surgió un altercado en el que dichas partes se agarraron mutuamente; y los brazos del acusado fueron sujetados por alguna persona de tal manera que no pudo sacar su revólver, por cuyo motivo lo disparó mientras todavía estaba debajo de la camisa. Después de haberse disparado el tiro, José Rosa se fué en dirección a su casa y cayó boca abajo, muriendo en ese mismo momento. El homicida corrió, con el revólver en la mano, a su propia casa, y llamó a su sirviente,

José Eraso, mandándolo a buscar la policía. Al llegar los guardias, él se entregó a los mismos, dándoles su revólver. El interfecto era más alto y más fuerte que el acusado.

Cuando Sutton llegó al terreno en cuestión, Rosa estaba sacando yucas. Sutton llevó su revólver debajo de su camisa. En el momento en que éste disparó el tiro, ambos o sea el homicida y el interfecto, se tenían mutuamente agarrados en el suelo. Se efectuaba una lucha entre los dos. Cuando Sutton fué examinado, tenía cinco rasguños en su cuerpo, y otras tantas roturas en su ropa que correspondían con dichos rasguños.

El sitio en que tuvo lugar la muerte de Rosa, no estaba en el terreno arrendado por este último. Las yucas no estaban en el terreno por el cual Rosa había pagado alquiler. No aparece de los autos a quién dichas yucas pertenecían. Los gandules crecían en matas grandes. La hermana del interfecto Flora Rosa, en unión de su hija mayor, estaban cogiendo gandules cerca del sitio en donde tuvo lugar el altercado. Ellas no podían ver muy bien al interfecto, por hallarse las matas de gandules entre ellas y el sitio en que estaba su hermano. La conversación entre el interfecto y el homicida, tuvo lugar en un tono ordinario, y no duró mucho tiempo.

Juana Rivera que es la suegra del interfecto, estaba en la casita, asistiendo a su hija que estaba de parto. Al oir el tiro ella salió de la casita y vió caer a Rosa, y a Flora y los hijos corriendo hacia él.

Además del homicida y el interfecto, había allí presentes en el momento de la muerte de Rosa, un tal Bartolo Arroyo; y, tal vez a poca distancia, José González, y la hermana del interfecto, Flora Rosa, y sus dos hijitas, y además su suegra, que estaba en la casita que se encuentra cerca del sitio de referencia. A alguna distancia de dicho sitio, se hallaba también un hombre que estaba trabajando en un cañaveral, llamado Césaro Fernández.

El acusado es americano, y tenía la reputación de ser un hombre de buena conducta, no habiendo tomado parte en

riña o pendencia alguna, y dedicándose a su trabajo; y es considerado como un caballero. El interfecto era puertorriqueño, y arrendatario del acusado.

### Cuestiones de hecho controvertidas.

1°. ¿Quién fué el agresor?

(*a*) Juana Rivera dice que "el acusado llegó y puso el pie alante, y le dió una gaznatada a José Rosa, el cual le puso la mano en la cintura, y entonces el americano le disparó un tiro y lo mató. José Rosa se fué encima del americano, amagándole, y entonces el americano le pegó el tiro. José Rosa y el acusado sólo tuvieron dos palabras, y no hubo lucha entre ellos. Al oir la voz del americano, salió la declarante al batey; hablaron dos palabras que no oyó la declarante; y cuando el americano le dirigió la palabra, José Rosa se enderezó, y el americano le tiró una gaznatada; entonces Rosa le puso las manos en la cintura al americano, y éste le disparó un tiro."

(*b*) Bartolo Arroyo dice que "llegando a su casa, oyó que hablaba José Rosa, y se asomó el declarante por la ventana de su casa, vió llegar a Mr. Sutton, y le dijo en voz baja una cosa a José Rosa; y al encontrarle éste, el americano le tiró un jinquetazo a José; éste jaló para atrás, y el americano metió la mano en el seno, Rosa saltó a empuñarlo; entonces reventó el tiro y cayó Rosa. Rosa fué el que saltó a empuñar al americano. José Rosa estaba en cuatro pies agarrado del acusado para no dejarle sacar el revólver. El americano tenía una mano fuera y otra dentro del seno que era donde tenía el revólver. Los dos estaban en cuatro pies, y José Rosa, con sus dos manos, tenía cogido al americano por los brazos."

(*c*) José González dice que "vió cuando el americano se encontró con (José) Rosa, agarrándose los dos, tirando en direcciones opuestas; (José para su casa y el otro para el otro lado) en medio de la lucha el americano jaló por su revólver, y le pegó un tiro a José Rosa quien cayó muerto. Que el acusado tenía el revólver dentro del seno de la pretina del pantalón, y lo sacó y pegó el tiro."

(*d*) Césaro Fernández dice que "sintió una bulla y vió a unos morenos que eran tres, peleando contra el acusado: al principio el declarante no conocía quien era, porque estaba en el medio escondido; y en eso lo empujaron, y sacó una pierna para atrás, y por el pantalón conoció el declarante que era el acusado. Sintió un tiro, y el que tenía sujeto al acusado, lo soltó y anduvo un paso largo y se cayó. José Rosa era el que tenía empuñado al acusado, y los demás estaban agrupados, siendo uno de ellos Bartolo; pero él no luchaba con el acusado pero estaban todos juntos."

(*e*) George Sutton, el acusado declaró en su propia defensa, que el día del suceso volteaba la finca y al pasar cerca de donde vivía José Rosa, lo vió trabajando en la tierra y vió dos individuos más conversando, a los cuales preguntó que ¿quién sembraba? Siguió hablando un rato con ellos y entonces Rosa avanzó un paso dándole al acusado con la mano. El declarante se defendió y sintió un puntazo en la mano derecha y vió sangre. Siguió luchando con Rosa para agarrarle la mano y cuando se la cogió, otro individuo le agarró por detrás y sintió un golpe de puño en la cabeza: el declarante metió la mano dentro de la camisa para sacar el revólver y el tercer individuo le cogió por la cintura aguantándole el brazo derecho por lo cual no podía sacar el revólver. Seguía teniendo sujeto al José Rosa el cual le estaba dando golpes y así estuvieron agarrados los cuatro: el declarante sintió un tajo en un pie, y levantando el cañón del revólver disparó un tiro por debajo de la camisa porque ya ha dicho que el brazo se lo tenía sujeto el otro individuo que se llama José González y disparó un tiro. En seguida lo soltaron todos, José Rosa anduvo unos quince o veinte pasos hacia su casa y cayó boca abajo.

2º. ¿Estaba el interfecto armado?

(*a*) Flora Rosa dice que el interfecto arrancaba la yuca con las manos, porque la tierra era arena y no tenía cuchillo.

(*b*) Juana Rivera dice que José Rosa estaba sembrando unas yautías, y después fué a sacar un pie de yuca. José

Rosa sacaba las yucas con la mano, y para trabajar, usaba de una azada, la cual dejó cerca de las yautías.

(*c*) Bartolo Arroyo dice que José Rosa sacaba unas yucas con la mano; no tenía armas, y cerca de sí no había cuchillos ni nada.

(*d*) José González dice que no reparó si José tenía algún cuchillo.

(*e*) George Sutton dice que vió en la mano de José Rosa un pedazo de machete; que vió sangre, y sintió un tajo en un pie, y que estaba herido, y que las heridas y los arañazos que el declarante tenía en su cuerpo, se los causó en la lucha José Rosa; que no fueron de alambre ni de ningún cuerpo extraño, sino que se los causó Rosa.

3°. *¿Estaba arañado el acusado por las púas de la cerca de alambre?*

(*a*) La testigo principal con respecto a la cerca de alambre, es María Rodríguez, quien declaró como sigue: que el once de marzo último, vivía en el "Cachete," y había varios vecinos, entre ellos José Rosa, que vivía más lejos; y ese día vió pasar al acusado por el corral de su casa, con un revólver en la mano, por los alambres, bajando la cabeza; que hay allí tres alambres de púas, dos caídos en el suelo y otro bien puesto en alto; que al pasar el acusado, se le desprendió un pedazo de la ropa por detrás, sin fijarse si era por la espalda, quedándose el pedazo en el alambre.

(*b*) A preguntas del abogado, dice que eso lo hizo llegar a oídos del Fiscal; porque la detective preguntó a la declarante, si había visto algo, y ella le contestó que había visto pasar por los alambres a Mr. Sutton, con el revólver en la mano: que cuando le preguntó eso la detective, no estaba presente Mr. Sutton, y no puede precisar la fecha en que le tomaron esa declaración, pero que la fecha en que la declarante vió pasar al acusado dicen que fué el once de mayo, y sostiene que en ese día, once de mayo, fué que vió pasar por el corral de su casa a Mr. Sutton.

(*c*) Dr. Manuel Fosas declaró que en ese día de referencia,

del Sr. Fiscal, vió al acusado como a las cinco de la tarde, observando varias heridas que tenía, superficiales, como arañazos, hechas con un instrumento poco cortante: algunas heridas estaban llenas de tierra, y cree que esa tierra háyase producido al caer en tierra después de estar herido el acusado o porque el arma con que fué herido, estuviese llena de tierra: en dos o tres heridas, observó el declarante que había tierra dentro de ellas; han podido ocasionarse con un instrumento poco cortante, como un mocho: las heridas correspondían a las ropas que tenía puestas el acusado.

(El abogado presenta, como prueba, dichas ropas, sin oposición del Fiscal, y la corte la admite.)

El testigo dice que esas ropas eran las que tenía puestas el acusado el día del suceso, y en la camisa hay un agujero como si fuera de bala, y una quemadura que corresponde al agujero: el acusado tenía cinco heridas, unas en el costado y en los muslos, y otras en la espalda, correspondiendo con las de las ropas.

Preguntado por el Fiscal, dijo que tales heridas de la espalda pudieron ser hechas por un alambre de púa, pero no así las del muslo: que los desgarres de la camisa pudieron ser hechos por alambre, y también pudieron ser hechos en lucha con otro individuo.

Vuelto a preguntar por el acusado mediante su abogado, dice que las heridas de detrás pudieron ser hechas por alambre o por un cuchillo de poco corte.

Preguntado por el juez, dice que reconoció al acusado en el pueblo, a las cinco de la tarde, estando distante la finca como unos diez minutos: las heridas eran superficiales e irregulares, tenían desgarres y pudieron ser hechas con un cuchillo o arma poco afilada y cortar también las ropas: pero haciendo fuerza; dichas heridas pudieron ocasionarse con un cuchillo no afilado; pero para cortar la tela que tiene la ropa, tiene que ser por un hombre de fuerza. Que el corte que hay en la pierna derecha del pantalón, puede producirla tanto un cuchillo afilado, como un machete, un espadín, una hoja de

sable ó un cuchillo de mesa, y el arma haber hecho fuerza en diferentes direcciones.

(*d*) Césaro Fernández dice que cuando el acusado echó a correr, "tenía la camisa rota y los trapos guindando."

(*e*) George Sutton dice que fué herido en la lucha con Rosa; que las heridas y los arañazos que tenía en su cuerpo, se los causó en la lucha, José Rosa; que después de la cuestión, el declarante no pasó por debajo de ningún alambre; y por eso puede asegurar que los arañazos no fueron de alambre ni de ningún cuerpo extraño, sino que se los causó Rosa.

En su dictamen, el juez sentenciador expone completamente sus ideas con respecto a este caso; y dicha exposición puede considerarse como equivalente a las declaraciones de hechos probados y conclusiones legales que la ley ahora exige a los jueces de distrito en todos los casos en que el juicio se celebre sin jurado. Para comprender completamente el punto de vista del juez inferior tanto al apreciar la prueba como al determinar para sí mismo la ley aplicable al caso, es lo mejor reproducir íntegra su opinión. Esta está concebida en los siguientes términos:

"Antes de dictar mi veredicto en este caso quiero hacer constar varios hechos y principalmente uno de ellos a cuya declaración me lleva, no sólo la prueba testifical, sino también y muy principalmente la prueba de inspección.

"Por toda la prueba practicada en este caso llego a la conclusión firme y sin género alguno de duda razonable, de que el día 11 de marzo de este año en las inmediaciones del pueblo de Bayamón, correspondiente a este distrito judicial, George Sutton, como encargado de una finca de la que José Rosa tenía arrendado un pedazo de tierra, encontró a éste en ocasión en que arrancaba de la tierra algunas yucas y para cuya operación no se valía de arma alguna, no la tenía consigo, ni inmediata a su persona. Que en tales condiciones y por cuestión de los arrendamientos se promovió una discusión entre George Sutton y José Rosa en la que el primero tiró unos bofetones al segundo, yéndose entonces ambos a las manos y du-

rante esa lucha, el acusado George Sutton, con un revólver que tenía bajo la camisa y sin sacar aquél, pero levantando algo el cañón, hizo un disparo que, atravesando el corazón de José Rosa, le produjo la muerte casi instantáneamente, después de lo cual el acusado huyó teniendo en su camino que cruzar como cruzó por cercas de alambre de púas que le produjeron varios rasguños en el cuerpo y rotura de la ropa correspondiente a esos sitios.

"Y un punto que deseamos hacer constar categóricamente es que la impresión que nos ha producido el examen de esas roturas de las ropas, presentadas por el acusado como prueba, fueron producidas por desgarro de las púas del alambre de la cerca y no de otra manera.

"El médico que algunas horas después del hecho ocurrido entre Sutton y Rosa reconoció al primero, admite que los rasguños o heridas de bordes sucios que presentaba el acusado en la espalda, hombros y piernas podían ser causadas por la púas de un alambre o también por algún instrumento de corte no afilado.

"Ante tales suposiciones, la corte se decide francamente porque las roturas de la ropa correspondientes a las heridas o rasguños reconocidas en el acusado no fueron por cuchillo o arma análoga sin filo o con poco filo, sino por púas de alambre.

"Hemos visto con mucha detención las roturas de esta ropa y por la forma en que están, por los diversos jirones que cada una de ellas presenta, entendemos y creemos firmemente que no fueron producidas en otra forma que la dicha, pues de lo contrario, esos cortes no tendrían las sinuosidades que representan sino que una linea más o menos limpia en sus bordes según el filo del arma con que se produjeran.

"Y esto sin contar con que el acusado, que es el único que habla de armas en manos del interfecto, ni afirma ese hecho categóricamente ni ha podido dar una idea de la clase de arma que éste tuviera.

"Y esta convicción la teníamos ya antes de que declarara

la testigo María Rodríguez, la que corrobora tal acepción al afirmar que vió al acusado cuando cruzaba por debajo de alambres de púas y con éstas se desgarraba la ropa, a tal punto que algunos jirones de la camisa quedaron enganchados en ellas.

"Por todo lo expuesto, somos de opinión de que el acusado es responsable del delito de homicidio voluntario de que ha sido acusado y que al realizar el hecho que se le imputa no lo verificó en defensa propia."

Al comparar la opinión del juez sentenciador con la exposición del caso, se verá que muchos de los hechos que él declara probados, tienen muy poco fundamento en las declaraciones de los testigos, y que sus conclusiones legales no han sido justa y debidamente deducidas de las pruebas certificadas por él en la exposición del caso.

El juez sentenciador ha entendido mal los hechos en varios puntos importantes. El consigna como un hecho probado, que el médico había declarado que "los rasguños o heridas de bordes sucios, que presentaba el acusado en la espalda, hombros y piernas, podían ser causados por las púas de un alambre, o también por algún instrumento de corte no afilado." Esto no está de acuerdo con los hechos certificados por el mismo juez sentenciador, en la exposición del caso. Dicha exposición dice: "Preguntado por el Fiscal, dice el doctor que tales heridas de la espalda pudieron ser hechas por un alambre de púa, *pero no así las del muslo:* que los desgarros de la camisa pudieron ser hechos por alambre, y también pudieron ser hechos en lucha con otro individuo." Por consiguiente, la conclusión del juez sentenciador, de que "las heridas o rasguños encontradas en el cuerpo del acusado, no fueron causados por cuchillo o arma análoga, sin filo o con poco filo, sino por púas de alambre," no está justificada por la declaración del doctor, en que su parte está basada.

Otro error de hecho en que claramente ha incurrido el juez sentenciador, es cuando dice: "Y esto sin contar con

que el acusado, que es el único que habla de armas en manos del interfecto, ni afirma ese hecho categóricamente, ni ha podido dar una idea de la clase de arma que éste tuviera.

Al contrario, Sutton en su declaración, tal como ésta se halla consignada en la exposición de hechos, dice positivamente que "vió en la mano de Rosa, un pedazo de machete." * * *. "Las heridas y los arañazos que el declarante (Sutton) tenía en su cuerpo, fueron causados por la lucha con José Rosa." * * *. "Después de la cuestión, el declarante no pasó por debajo de ningún alambre, y por eso, puede asegurar que los arañazos no fueron de alambre sino que se los causó Rosa.

El hecho de que Sutton disparara el tiro fatal de su revólver mientras dicha arma estaba dentro de su camisa, lo trata el juez sentenciador como demostrando que dicho acusado se valió injustamente de una ventaja que tenía sobre el interfecto, haciendo por completo caso omiso de la declaración de Juana Rivera de que Rosa "le puso las manos en la cintura al americano"; y de la de Bartolo Arroyo, de que "los dos estaban en cuatro pies, y José Rosa, con sus dos manos, tenía cogido al americano por los brazos"; y la de José González, de que "en medio de la lucha, el americano jaló por su revólver, y le pegó un tiro a José"; y la del Dr. Fosas, de que "en la camisa hay un agujero como si fuera de bala, y una quemadura que corresponde al agujero"; y la de Césaro Fernández de que "José Rosa era el que tenía empuñado al acusado, y los demás estaban agrupados"; y la del mismo Sutton, de que "sintió un tajo en un pie, y levantando el cañón del revólver disparó un tiro por debajo de la camisa, porque ya ha dicho que el brazo se lo tenía sujeto José González."

Al comentar la declaración del Dr. Fosas, el juez sentenciador dice, además, que dicho doctor *admite* que las heridas o arañazos observados en el cuerpo del acusado, podían ser causados por las púas de una cerca de alambre, tratando, de este modo al testigo como si representara al acusado y

no como un perito presentado por el Estado, para dar una opinión profesional con respecto a los hechos del caso. En otro párrafo, el juez sentenciador habla de las opiniones expresadas por el testigo médico, como de *"suposiciones,"* lo que demuestra que la declaración del perito fué completamente desatendida, aunque no hay en los autos nada que justifique su rechazamiento; sino, al contrario, dicha declaración parece ser completamente digna de crédito. Ciertamente que en cuanto a estos particulares, hubo un grave error con respecto a las circunstancias en dicho caso.

El juez sentenciador trata de afirmar, a consecuencia de un examen que hizo de la ropa, y por la forma de las roturas de la misma, que las heridas que existían en el cuerpo del acusado habían sido causadas por las púas de la cerca de alambre; aunque la declaración del perito expresa que algunas de dichas heridas no pudieron ser causadas así; y que otras pudieron ser hechas por los alambres de la cerca, y también pudieron serlo con un cuchillo de poco corte u otra arma análoga. De este modo el juez se constituye en perito, en oposición al testigo perito presentado por el ministerio fiscal. Esto era una crasa irregularidad que ocasionó un gran perjuicio a la causa del acusado.

Estos errores por parte del tribunal sentenciador, se refieren a puntos esenciales y claramente demuestran una apreciación equivocada de la prueba y el consiguiente desvío de justicia.

Comparemos ahora los hechos, según han sido declarados probados por el juez sentenciador, en la opinión que antecede, con los consignados y explicados por el mismo juez, en la exposición del caso reproducida anteriormente. Un detenido examen demostrará un manifiesto descuido por parte del tribunal sentenciador de aquilatar y apreciar debidamente las pruebas aducidas. Se rechaza completamente la declaración del acusado aún cuando dicha declaración está corroborada por las de otros testigos, y por hechos admitidos y las circunstancias que rodeaban el caso. Ningún testigo declara

que se haya buscado en el sitio donde ocurrió la lucha, el pedazo de machete que el acusado dice tenía en la mano el interfecto, y con el cual fué herido el acusado.

Las declaraciones de las dos mujeres son muy contradictorias e incompatibles, y no debían recibir mucha consideración, estando basadas en gran parte en lo dicho por otras personas, y evidentemente modificadas por su parentesco con el difunto. La declaración de Bartolo Arroyo también demuestra que él era un amigo íntimo, un compadre del interfecto; y dicha declaración evidentemente no es un relato completo e imparcial de cuanto supo del asunto. El trató claramente de ocultar la parte que él mismo tomó en el combate, y de evitar de decir nada a favor del acusado.

La declaración de José González no está sujeta a ninguna crítica adversa; pero, según se halla consignada en los autos, es muy escasa.

El único testigo que parece haber observado serenamente la riña, y haber sido absolutamente imparcial en sus sentimientos y declaraciones, fué Césaro Fernández; y él corrobora la declaración del acusado en muchos puntos importantes. Si es que él dijo la verdad, entonces la muerte de Rosa ocurrió en defensa propia por parte de Sutton, y era casi sino enteramente inevitable. ¿Por qué no había de darse por parte del tribunal sentenciador, la debida importancia a dicha declaración en la decisión con respecto a la culpabilidad o inocencia del acusado?

No se concibe que Sutton ni ningún hombre cuerdo, hubiera salido para la finca que tenía a su cargo, para matar a un inquilino a quien nunca había visto antes de aquel día sin provocación de ninguna clase, sin lucha alguna, cuando no había peligro inminente para él, y cuando sólo se habían cambiado unas cuantas palabras entre él y dicho inquilino, en un tono de voz baja.

Si hubiera sido necesario para la decisión del presente caso, pudiera muy bien haberse determinado por este tribunal, que el juez sentenciador en su opinión y sentencia come-

tió manifiestos errores; y que, por lo tanto, había habido un desvío de justicia en la decisión de este caso. Y con tal que el tribunal hubiese llegado a esta conclusión, ciertamente no debería haberse permitido que subsistiera la sentencia condenatoria dictada por el tribunal inferior.

No concibo ni por un momento el pensamiento de que el eminente juez que conoció de esta causa en la corte inferior, haya obrado bajo la influencia de parcialidad, apasionamiento o prevención; pero, al hacerse una cuidadosa inspección de los autos en el presente caso, ciertamente se ponen de manifiesto varios errores; y en consecuencia de los mismos, el acusado ha sido privado de un juicio imparcial.

En vista de las pruebas, el juez sentenciador declara correctamente como un hecho probado, que hubo un combate entre el homicida y el interfecto, o una lucha, si éste es un término más adecuado. Por consiguiente, ¿por qué había de excluir al acusado de los beneficios de su alegación de defensa propia? Aún cuando el interfecto haya estado desarmado, él era un hombre alto y muy fuerte, capaz de hacer un gran daño corporal al acusado, y este hecho era bien sabido por ambos combatientes.

Por supuesto, según hemos declarado frecuentemente, cuando las pruebas son contradictorias, debemos presumir que el juez sentenciador que juzgó el caso sin un jurado, ha dado la debida importancia y crédito a las declaraciones de los diferentes testigos, a no ser que en la revisión del caso entero, lleguemos a la convicción de que el juez ha sido dominado por parcialidad, apasionamiento o prevención, o que se ha cometido un manifiesto error, y que, por consiguiente, se ha hecho una injusticia.

Pero tal presunción como la que se hace a favor de las conclusiones de hecho formuladas por el juez, no existe con respecto al proceder de dicho juez, al aplicar la ley a los hechos. Por ejemplo, si nosotros llegamos a la conclusión de que el juez ha declarado como un hecho probado que el interfecto no estaba armado, a pesar de que las declaraciones

con respecto a este punto, sean contradictorias, y que de este simple hecho ha deducido como punto de derecho, que no puede haber habido defensa propia; y que con este motivo, ha privado al acusado de los beneficios de la alegación de defensa propia, este es un error de derecho que haría necesaria la revocación de la sentencia.

Esto es precisamente lo que ha hecho el juez sentenciador, a pesar de que no solamente hubo un altercado, sino una lucha, y los brazos del acusado estaban agarrados por sus adversarios, de tal modo que no podía defenderse eficazmente; y en tal situación, dicho acusado cogió su revólver debajo de su camisa, siéndole imposible sacarlo; y en este estado de cosas, se disparó el tiro fatal. El proceder del acusado, si obró en defensa propia, lo que es evidente para mí, era plenamente justificable; y no ha debido declarársele culpable.

Debe tenerse presente, además, que tanto en un juicio celebrado ante un juez sólo, como en el celebrado ante un jurado, el acusado tiene derecho al beneficio de cualquiera duda razonable con respecto a su culpabilidad o a la existencia de cualquier hecho esencial que sea necesario para probar dicha culpabilidad. ¿Puede alguien revisar serenamente todas las pruebas en el presente caso, dando crédito a los hechos no contradichos, y aquilatando y comparando cuidadosamente las declaraciones contradictorias de los testigos, y decir, en conciencia, que Sutton no obró en defensa propia, y que, por lo tanto, era culpable del delito que se le imputa?

Yo, por mi parte, ciertamente no lo puedo decir. Seguramente, que en tales circunstancias, según mi opinión, no debe permitirse que la sentencia condenatoria quede subsistente.

Hay un manifiesto error en el juicio de esta causa ante la corte de distrito, por haberse apreciado indebidamente las pruebas, rechazando unas y dando indebida importancia a otras; y por haberse hecho deducciones injustificadas de hechos controvertidos, e interpretado y aplicado erróneamente las disposiciones legales, especialmente las referentes a la defensa propia, en perjuicio de los derechos del acusado como

ciudadano que antes de la riña fatal, había observado una conducta ordenada en su propia finca. Así es que ha debido revocarse la sentencia de la corte inferior, y concederse un nuevo juicio al acusado.